POWERS v BAKER-PERKINS, INC

Docket No. 78-2956. Submitted June 14, 1979, at Lansing.—Decided October 1, 1979. Leave to appeal applied for.

Mark Powers was injured while operating a commercial dough-mixing machine. He brought an action for damages against Baker-Perkins, Inc., which was the successor to the machine's manufacturer, Century Machine Company. Powers alleged that Baker-Perkins has successor liability for his injuries, that Baker-Perkins had a duty to warn users of the dangers of the dough mixer, and that Baker-Perkins had failed to do so.

The machine was manufactured by Century prior to 1929. In 1929, Baker-Perkins acquired Century by an exchange of stock, and subsequently operated Century as a wholly-owned subsidiary until 1957, at which time the assets of Century were either sold or incorporated directly into Baker-Perkin's operations, and the Century corporation was dissolved. Baker-Perkins continues to use the trade name "Century", several members of Century's management were offered positions with Baker-Perkins following dissolution, and Baker-Perkins assumed responsibility for Century's accounts payable during part of 1957 and insured itself against the type of liability claimed by Powers.

Baker-Perkins moved for summary judgment and the Saginaw Circuit Court, Joseph R. McDonald, J., granted the motion on the basis that Powers had failed to state a claim upon which relief could be granted and that, except as to damages, there was no genuine issue of material fact. Powers appeals. *Held:*

The question of whether Baker-Perkins, as the successor corporation of Century, could be liable for Power's injury is to be decided using products liability principles rather than principles of corporate law. There was in this case a continuation of the business such that after 1929 Century may have become Baker-Perkins. Because Century was an Ohio corporation, Ohio law governs the liability of the corporation, and under that law

REFERENCES FOR POINTS IN HEADNOTES
[1] 73 Am Jur 2d, Summary Judgment § 35.
[2] 63 Am Jur 2d, Products Liability § 5.
Liability of successor corporation for injury or damage caused by product issued by predecessor. 66 ALr3d 824.

Powers may still bring an action against Century as an added defendant.

Reversed and remanded for further proceedings.

1. JUDGMENT — SUMMARY JUDGMENT — APPEAL AND ERROR.

Review of a summary judgment is to be made viewing the facts in the light most favorable to the party against whom the summary judgment was found.

2. PRODUCTS LIABILITY — SUCCESSOR CORPORATIONS — CORPORATE LAW.

A products liability case brought against a corporation which is a successor to the corporation which manufactured the allegedly defective product is to be decided on principles of products liability law rather than by reexamining and adjusting corporate law principles.

*Jaffe, Snider, Raitt, Garratt & Heuer, P.C.* (by *Brian G. Shannon),* for plaintiff.

*Harvey, Kruse & Westen, P.C.,* for defendant.

Before: ALLEN, P.J., and T. M. BURNS and D. E. HOLBROOK,* JJ.

D. E. HOLBROOK, J. This is a products liability action brought by plaintiff, Mark Powers, for injuries received while operating a dough mixer manufactured by Century Machine Company, against Baker-Perkins, Inc., purchaser of Century Machine Company. Defendant's motion for summary judgment was granted by the trial court and plaintiff appeals as of right.

The facts as alleged in plaintiff's complaint, amended complaint, Baker's admissions and interrogatory answers appear to show that Mark Powers suffered serious injuries while operating a commercial dough-mixing machine designed and

---

* Former Court of Appeals Judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

manufactured by Century Machine Company, now a defunct corporation. Plaintiff Powers contends that defendant Baker-Perkins has "vicarious", "successor" or "enterprise" liability for plaintiff's injuries. Further, plaintiff claims that Baker had a duty to warn users of certain dangers associated with the dough mixer's operation, which Baker-Perkins failed to do. The merits of Powers' claim were not before the trial court and are not now before our Court. This matter concerns only the products liability consequences of Baker-Perkins' relationship to Century.

On June 6, 1973, Powers suffered traumatic amputation of both arms and other serious injuries while using a Century commercial dough-mixing machine in the course of his employment. The dough-mixer had no guard or interlock device to prevent entry of the operator's hand while it was running.

The machine was designed, manufactured and sold by Century sometime prior to 1929. On July 22, 1929, Baker-Perkins acquired all the outstanding shares of Century's stock in exchange for 6000 shares of its own stock, thus becoming Century's sole shareholder. Baker-Perkins is, as Century was, a manufacturer of bakery machinery. Baker-Perkins operated Century as a wholly-owned subsidiary, continuing to use the Century name and to manufacture the Century product line at the same location with the same employees for many years following the acquisition. Five members of Baker-Perkins' board of directors were also directors of Century and at least two officers of Baker-Perkins were officers of Century.

In 1957 Baker-Perkins decided to close down the Century plant and end the corporate existence of Century. Certain of the subsidiary's assets were

distributed to Baker-Perkins and its Canadian affiliate both before and at the time of the formal dissolution. Baker-Perkins held title to Century's land and plant until September 1958, about a year after Century had ceased operating, at which time Baker-Perkins sold it to an unrelated buyer. The machinery necessary to manufacture replacement parts for the Century product line was transferred to Baker-Perkins' Saginaw operation and its Canadian affiliate. Some of these machines were transferred prior to Century's dissolution. Other Century assets were sold at auction in September 1957, and Century closed its books the following month, two months before the effective date of dissolution in December. Century had transferred $650,000 in cash to Baker-Perkins by the forepart of November. With other liquid assets and the Century plant Baker-Perkins probably realized about $1,500,000 in addition to the machinery, inventory, drawings, plans, and marketing and sales data which it retained.

These retained assets not sold by Baker-Perkins were incorporated directly into the operations of Baker-Perkins and its affiliates. After Century's dissolution, Baker-Perkins marketed and its Canadian affiliate marketed and manufactured bakery equipment (including dough mixers) under the trade name "Century". Baker-Perkins continues to the present to manufacture and distribute replacement parts for Century dough-mixers.

At least five members of Century's management were offered positions with Baker-Perkins following dissolution.

Baker-Perkins assumed responsibility for Century's trade payables during the last two months of 1957.

Baker-Perkins has insured itself against the liability claimed by Powers.

In an opinion dated March 17, 1978, the trial court ruled that it would grant Baker-Perkins' motion for summary judgment under GCR 1963, 117.2(1) and (3), unless Powers amended his complaint to set forth additional facts establishing "successor" liability. Plaintiff filed a first amended complaint which more clearly alleged the grounds of liability claimed against Baker-Perkins, but which did not contain significant additional evidentiary facts. On July 13, 1978, the trial court entered an order granting Baker-Perkins' motion for summary judgment.

Plaintiff presents on appeal the following issue:

*Did the trial court err in finding no genuine issue of material fact as to whether Baker-Perkins' relationship with Century was such that:*

*(a) Baker-Perkins is vicariously liable for Century's products liability, or*

*(b) Baker-Perkins had a duty to warn users of Century's unguarded dough-mixers?*

As this case ended in summary judgment, the facts must be viewed in the light most favorable to plaintiff, against whom the summary judgment was found, *Turner v Bituminous Casualty Co,* 397 Mich 406; 244 NW2d 873 (1976). Both parties to this suit cite the *Turner* case as supporting their respective positions on liability.

*Turner* is helpful because it did set forth some fundamental rules. Mr. Justice WILLIAMS, speaking for the Court, stated in part as follows:

"After the transfer of the name, personnel, properties and products of a manufacturing corporation in a cash sale, and the corporation's subsequent dissolution as a part of the acquisition plan, an injury occurred on a press manufactured and sold by that corporation prior to the corporate transfer. The purchasing corporation

was sued in tort and defended on the basis that it was a corporate stranger to the manufacturer and hence not liable.

"Where the corporate transfer involves either a merger or a de facto merger, the law is clear that liability attaches to the consolidated or acquiring corporation. The issue here narrows down to whether an acquisition for cash should be treated the same as an acquisition for stock; and, if so, under what circumstances.

"In our opinion there may be a cause of action where the totality of the transaction demonstrates a basic continuity of the enterprise." 397 Mich at 411.

"This is a products liability case first and foremost.

"Products liability law is a fast-developing area. All the rules have not yet been formulated and products liability law, as it matures, has to shake off various impediments associated with traditional concepts, which, while relevant to other problems, are inappropriate for this new area.

"Thus, for example, it was not until *Spence v Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120, 135; 90 NW2d 873 (1958), that we rejected the indirect approach and forthrightly abolished the requirement of privity in products liability cases. We did so because we were persuaded that the concept of privity of contract had nothing to do with liability or nonliability predicated on the law of torts.

"In a similar vein, the New York Court of Appeals rejected the contractual statute of limitations in products liability cases, reasoning that '(r)ather than arising out of the "will or intention of the parties", [products liability] * * * is predicated largely on considerations of sound social policy'. *Victorson v Bock Laundry Machine Co,* 37 NY2d 395; 335 NE2d 275, 277; 373 NYS2d 39 (1975).

"For the same reasons, defendants' reliance on the so-called 'general rule of non-liability' whereby, with certain limited exceptions the purchasing corporation is not liable for obligations of the transferor corporation, is inapposite. That rule developed not in response to products liability problems, but largely in the areas of

creditors' protection, Note, *Assumption of Products Liability in Corporate Acquisitions,* 55 Boston U L Rev 86, 95 (1975), and of tax assessments, *Cyr v B Offen & Co, Inc,* 501 F2d 1145, 1150 (CA 1, 1974), or, in the case of the de facto merger, in the context of shareholder rights. See *Applestein v United Board & Carton Corp,* 60 NJ Super 333; 159 A2d 146, 151 (1960); *aff'd* 33 NJ 72; 161 A2d 474 (1960). Most of these policies may fairly be said to have arisen from case law, and are not specifically found in the statutes.

"While the Legislature has spoken directly to problems of creditors and shareholders, nonetheless the courts have had to fill in the interstices where legislation was lacking. Consequently, it is not surprising in the much newer field of products liability to find that legislatures have not yet come to grips with some of the problems of the victim of defective products and that therefore the courts must do so.

"Further, case law that developed to protect the rights of creditors and minority shareholders, in all probability is not applicable to meeting the substantially different problems associated with products liability torts. Thus, not only do we operate in a relatively uncharted field when we explore the ramifications of products liability, but the facts of the instant case reveal a situation not previously dealt with in our jurisdiction.

\*     \*     \*

"In order to develop a reasonable rule for products liability cases which arise subsequent to corporation transfers, it is necessary to go back to basics. In doing so we must review the problem from the standpoints of both the plaintiff injured person and the defendant acquiring corporation.

"To the injured person the problem of recovery is substantially the same, no matter what corporate process led to transfer of the first corporation and/or its assets. Whether the corporate transaction was (1) a traditional merger accompanied by exchange of stock of the two corporations, or (2) a de facto merger brought about by the purchase of one corporation's assets by part of the stock of the second, or (3) a purchase of

corporate assets for cash, the injured person has the same problem, so long as the first corporation in each case legally and/or practically becomes defunct. He has no place to turn for relief except to the second corporation. Therefore, as to the injured person, distinctions between types of corporate transfers are wholly unmeaningful.

"From the corporate point of view likewise, the implications of a possible products liability suit after transfer do not depend on the form of corporate transfer. Regardless of the mode selected, both transferor and transferee wish to know as exactly as possible what they are buying and selling in order to establish an appropriate price.

"Further, the transferee would be equally handicapped by products liability suits developing after the transfer has occurred, regardless of what that transfer is called. Once the deal is made and the transferor corporation is extinguished, the transferee has nowhere to go for relief.

"Despite this reality, the traditional corporate law approach in non-products-liability cases has been to largely condition successor responsibility on whether the transaction is labeled a merger, a de facto merger, or a purchase of assets for cash.

"It is the law in Michigan that if two corporations merge, the obligations of each become the obligations of the resulting corporation. *D F Broderick, Inc v Continental Credit Corp,* 309 Mich 546, 550; 16 NW2d 68 (1944). In such a situation, therefore, the injured person could sue the new corporation.

"This is also true if, regardless what the parties call it, the transaction is deemed to be a de facto merger. *E.g., Shannon v Samuel Langston Co,* 379 F Supp 797, 801 (WD Mich, 1974); *Fairfield v Samuel Langston Co,* No K-18-71 CA (WD Mich, May 12, 1974); *Knapp v North American Rockwell Corp,* 506 F2d 361 (CA 3, 1974). As summarized in *Shannon,* the requirements of a de facto merger are:

" '(1) There is a continuation of the enterpise of the seller corporation, so that there is a continuity of

management, personnel, physical location, assets, and generally business operations.

" '(2) There is a continuity of shareholders which results from the *purchasing corporation paying for the acquired assets with shares of its own stock,* this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

" '(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

" '(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.' Citing *McKee v Harris-Seybold Co, Div of Harris-Intertype Corp,* 109 NJ Super 555; 264 A2d 98, 103-105 (1970), *aff'd* 118 NJ Super 480; 288 A2d 585 (1972). (Emphasis added.)

"The defendant herein contends that where there is a cash transfer, as opposed to the stock transaction described in the second principle, *supra,* the injured party is not entitled to sue. *McKee,* 264 A2d 104." 397 Mich at 416-420.

"Summarizing then, logically and teleologically, there is no basis for treating a purchase of corporate assets different from a de facto merger. Both the injured party and the transferee corporation have common goals in each situation. It would make better sense if the law had a common result and allowed products liability recovery in each case.

"This is precisely the result when the problem is correctly treated as a products liability case and is decided on products liability principles rather than simply by reexamining and adjusting corporate law principles.

"As the court in *Alad [Ray v Alad Corp,* 55 Cal App 3d 855; 127 Cal Rptr 817, 821 (1976)] so forthrightly stated:

" 'This case has nothing to do with * * * the technical differences between a sale of assets * * *, mergers, consolidation * * * and the many other ways by which ownership of the Alad manufacturing enterprise could

have been transferred from Hambly to Stern and his associates.

" 'The issue is, rather, one of tort law: does a manufacturer's responsibility for its defective products survive a change in ownership, where the manufacturing business, as such, maintains its identity and continues to operate as before "at the same old stand" ' ". 127 Cal Rptr 819-820.

* * *

"With products liability in mind, the most significant opinion for our guidance is *Cyr v B Offen & Co, Inc,* 501 F2d 1145 (CA 1, 1974). The assets of one corporation were purchased for cash by the defendant company. Two persons were subsequently injured by a machine built by the first corporation. Defendant contended it was a stranger to the sale of the machine. The opinion, in allowing recovery, is noteworthy in three regards. First, it recognized the problem as one of tort. Second, it clearly relied on the rule of 'continuity'. Third, it recognized the underlying policy 'that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than the consumer'. 501 F2d 1145, 1154.

"The Court of Appeals said:

" 'Thus, where *tort liability* is concerned, we should look to factors relevant to the specific claim and not be bound by the factors that control where other debts and liabilities are concerned. But first we face two threshold arguments. Offen first contends that it could not be held liable to plaintiffs for the simple reason that it was not in existence when the equipment was sold and installed and thus had no relationship with buyers or users of the equipment on which a duty of care could be predicated. *This argument begs the question at issue: should B. Offen & Co., Inc. be treated as the continuation of B. Offen Company?* The corporate veil has never been treated as an iron curtain barring examination of the facts peculiar to the individual case.

* * *

" '* * * The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products

are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to guage the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.

" '* * * [I]t is true that the successor, by definition, was not the legal entity which launched the product on the stream of commerce or made an implied representation as to its safety. But in the most real sense it is profiting from and exploiting all of the accumulated good will which the products have earned, both in its outward representations of continuity and in its internal adherence to the same line of equipment.' 501 F2d 1145, 1153, 1154. (Footnotes omitted, emphasis added.)" 397 Mich at 423-425.

"Defendant contends that it is necessary to insulate transactions involving the purchase of assets for cash from the possibility of successor liability for defective products in order to avoid crippling the market for such purchases. This kind of objection was made and ultimately rejected, for example, when courts debated when the statute of limitations should start running in products liability cases. It is even less persuasive in the present context of an existing, thriving market in corporate mergers, where the possibility of such liability is already established.

"Even the argument of surprise is likewise without merit.

" 'While the first such successor to be faced with such a liability may claim surprise, the claim lacks legal force. For this kind of surprise is endemic in a system where legal principles are applied case by case and is no more an injustice than was the retroactive application of the strict liability doctrine in *Stephan v Sears, Roebuck & Co,* 110 NH 248, 266 A2d 855 (1970).' 501 F2d 1145, 1154." 397 Mich at 427-428.

"In our analysis of the matter we must conclude at

this point that in a products liability case where the corporation fabricating the injury-producing item changes corporate structure before injury and suit, as a matter of policy neither the victim nor the successor corporation has a different interest vis-à-vis the suit whatever the type of corporate metamorphosis— merger, de facto merger, or sale of assets for cash—so long as the transferor corporation becomes defunct.

"While a difference in degree can be established between the continuity arising from a stock transfer as opposed to a cash payment for assets, it is just that, a difference in degree. Logically it is not dispositive. As the brief of defendant, set out above, so eloquently indicates, continuity through transfer from the first corporation to the second of its policy, operations, personnel and properties is the major purpose of the acquisition and corporate change. It is this continuity that makes business sense. It is the consideration for the whole deal.

"These reasons lead us to believe that the first, third and fourth criteria quoted in *Shannon* from *McKee* as tests of continuity of interest, and therefore responsibility, are all relevant, with the first as perhaps of greatest significance.

"Furthermore, we must recognize that it does not make sense or promote justice to require a merger and a de facto merger to respond to products liability suits, and then to leave a transfer of assets for cash free from suit, when the needs and objectives of both the injured party and the corporation are the same in all three instances. Finally, it is difficult to see that the possibility of products liability litigation is a manageable problem in mergers and de facto mergers, and an unmanageable one when corporate assets are sold for cash.

"As a consequence, we adopt the rule that in the sale of corporate assets for cash, the first, third and fourth criteria set forth in the *Shannon* quotation from *McKee* shall be guidelines to establish whether there is continuity between the transferee and the transferor corporations. If there is such continuity, then the transferee must accept the liability with the benefits.

"Applying to the relevant principles the facts devel-

oped in the instant case prior to summary judgment, we find:

"1) There was basic continuity of the enterprise of the seller corporation, including, apparently a retention of key personnel, assets, general business operations, and even the Sheridan name.

"2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

"3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.

"4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation." 397 Mich at 429-430.

Plaintiff herein claims that Baker-Perkins should be liable for the plaintiff's injuries because in fact it was and is the successor of Century. Continuity of the enterprise is plaintiff's argument, when viewed from the totality of the transaction. He claims that products liability law should govern in this case, and *Turner* is cited as his authority. Further, there is no applicable contractual statute of limitations in products liability cases because such liability is predicated largely on considerations of sound social policy.

Fundamentally, *Turner* views the whole problem facing both the injured person and the defendant acquiring corporation. An injured plaintiff, in order to win redress must look to the successor corporation because the transferor corporation has become defunct. He has no part in the type of corporate transfer conducted by the parties involved, and usually has no knowledge of the situation until later when he is injured and seeks legal counsel. Even then, he personally does not attach

meaning to the types of corporate transfers. From the corporate point of view the implications of a possible products liability suit after transfer do not ordinarily depend upon the form of corporate transfer. It is very important to both corporations to know what they are buying and selling in order to establish a proper price.

In the instant case we would have a de facto merger but for satisfying the third requirement as set forth in *Shannon v Samual Langston Co,* 379 F Supp 797 (WD Mich, 1974), see *Turner,* at 420, *i.e.,* the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. Baker-Perkins, sole owner of Century, continued Century as a wholly-owned subsidiary for 28 years before dissolving Century. As to continuity, as set forth in *Turner* at 430, the instant case appears to satisfy all but the second condition, again, that the seller corporation liquidate and dissolve as soon as possible after distribution of consideration received for its assets. This is true unless we consider the purchase as occurring when Baker-Perkins dissolved Century in 1957; in that event, whether Baker-Perkins continued the business of Century is a question of fact.

*Turner* cites the case of *Ray v Alad Corp,* 55 Cal App 3d 855; 127 Cal Rptr 817 (1976). Also see the opinion of the California Supreme Court at 19 Cal 3d 22; 136 Cal Rptr 574; 560 P2d 3 (1977), for the principle that the case is decided on products liability principles rather than by simply reexamining and adjusting corporate law principles. *Turner,* at 423.

In answer to the plaintiff's position in this case, defendant Baker-Perkins replies that Century was incorporated under the laws of Ohio in 1915. In

1929 defendant acquired all the capital stock of Century from Century's shareholders. For 28 years defendant operated Century and continued to manfacture equipment and operate as a separate, independent Ohio corporation. On December 3, 1957, the stockholder of Century, being Baker-Perkins, voted that Century be dissolved as of December 31, 1957. Assets of Century were sold or retained by Baker-Perkins. This dissolution of Century was totally in compliance with Ohio law and Baker-Perkins did not carry on any of Century's business after such dissolution. The mixer in question was manufactured by Century before defendant purchased Century and there is no basis under *Turner* for defendant to be held liable herein.

Technically, under *Turner* and *McKee v Harris-Seybold Co, Div of Harris-Intertype Corp,* 109 NJ Super 555; 264 A2d 98 (1970), there was no merger, actual or de facto, unless we consider the dissolution and defendant's acquiring Century as occurring at the same time in 1957. In so considering we would in effect give substance to the form of defendant's claim that the corporate law would override the products liability principles hereinbefore enumerated. This we are reluctant to do. However, if this is the law in Michigan then plaintiff should have the right to show, if he can, the continuity of Century's business by defendant after 1958 when Century was finally wound up.

We approach the issue differently and consider whether, in fact, defendant, even though operating Century as a wholly-owned subsidiary, operated Century as a successor or continuing operation.

First we point out that *McKee* has been overruled in part by the case of *Wilson v Fare Well Corp,* 140 NJ Super 476; 356 A2d 458 (1976).

The *Wilson* Court first noted that liability may be imposed upon a successor corporation when there has been a merger or consolidation. 140 NJ Super 485. Neither of those conditions applies to our case, and therefore neither need be discussed here.

The Court further observed, however, that a de facto merger or consolidation will also operate to impose liability. *Id.* The characteristics involved here include "transfer or sale of all assets, exchange of stocks, change of ownership whereby stockholders, officers and creditors go to the surviving corporation, and assumption of a variety of liabilities pursuant to previously negotiated agreements."

The next possibility recognized by the *Wilson* Court was liability imposed via a continuation of a business which could "be said to occur where the operations of the selling corporation become those of the buying corporation. The primary elements of continuation include use of the same name, at the same location, with the same employees and common identity of stockholders and directors." *Id.*

After analyzing several applicable cases the Court observed, p 490:

"Therefore, if one adheres to the more modern approach, the most relevant fact [in determining liability] is the degree to which the predecessor's business entity remains intact. The more a corporation physically resembles its precedessor, the more reasonable it is to hold the successor fully responsible. In this way, the innocent, injured consumer is protected without the possibility of being left without a remedy due to the subsequent corporate history of the manufacturer."

The *Wilson* Court then found C & K, a successor corporation, liable on both the de facto merger and

"complete continuation of business" theories. Since the de facto merger theory is inapplicable to the facts in our case, we will not discuss this aspect of the *Wilson* case further.

*Wilson* then pointed out that liability also attached to D & F, another successor corporation, for the tortious acts of its predecessor on the "continuity of business" theory although the requirements for a de facto merger or consolidation were not met because there was no stock transfer, a different location was used to manufacture the same product, and certain personnel were changed. In applying the "continuation" theory to C & K, the Court noted that every aspect of the predecessor's operation was assumed by C & K. Half of the purchase price was with stock. Most of the contractual and property liabilities were expressly assumed. All management and other personnel were taken on by C & K. As to the "continuation" theory vis-à-vis D & F, the Court pointed out that the latter became a "new hat" for the predecessor company. Two top personnel of the predecessor became in charge of manufacturing and servicing the same product for D & F. Other predecessor personnel also went to D & F. D & F stated that the transaction was a "joining of the two longstanding companies" and that it was "taking over and carrying on" their business. *Wilson,* 140 NJ Super at 491. This indicated that D & F agreed to assume all the benefits and burdens of its predecessor in the continuation of the business.

It appears to us that the *Wilson* Court's analysis of the essential ingredients of the "continuation" theory is germane to our fact situation.

One additional point raised in *Wilson* deserves consideration. The *Wilson* Court, at 491 begins discussion of what it calls an "independent ground

for liability" by referring to *Chadwick v Air Reduction Co, Inc,* 239 F Supp 247, 250 (ND Ohio, 1965), which states the general proposition that the mere purchase of the assets of a manufacturer which had put a negligently designed device into the channels of trade imposes no duty to warn third persons of the negligence even when the buying corporation becomes aware of the negligence.

*Wilson* then cites *Shane v Hobam, Inc,* 332 F Supp 526 (D Pa, 1971), as criticizing *Chadwick* and as evaluating the "modern approach of an independent ground for liability, *i.e.,* when some control over the product is given to the successor, as in servicing, or the successor becomes aware of a defect in the product, there is an assumption of liability for injuries thereafter caused by that product". 140 NJ Super at 492.

*Wilson* concludes its analysis by stating at 493:

"In finding that there was a *de facto* merger between Hunter and C & K, that there was a continuation of business by C & K and D & F, and that an independent ground for liability may be imposed upon C & K and D & F upon a showing of control over, or knowledge of, the defective product, the court is departing from the narrow approach of *McKee* and adopting the more modern, fair-minded broad approach as stated in *Shannon* and *Shane, supra."*

It thus appears to us that *Wilson* found liability against successor corporations on three separate grounds: (1) de facto merger; (2) continuation of business; and (3) the additional independent ground for liability when some control over the product is given to the successor, as in servicing, or the successor becomes aware of a defect in the product, causing an assumption of liability by the

successor for injuries thereafter caused by that product.

It appears to this Court that plaintiff may prevail herein under *Wilson* if his proofs satisfy the requirements and we find that he has asserted sufficient facts in his pleadings to present proofs in a trial of the case.

*Turner* considered the *Ray v Alad Corp* case, 19 Cal 3d 22; 136 Cal Rptr 574; 560 P2d 3 (1977), and we believe it to be helpful in the instant case to understand better its interpretation of the developing law of products liability.

The *Ray* court began its analysis by candidly recognizing that liability on the part of Alad II, a purchasing corporation, to plaintiff could *not* be found on any of the four traditional grounds for imposing liability on a purchasing corporation. Thus, there was no express or implied agreement to assume liability for injury from defective products previously manufactured by Alad I, the selling corporation. Similarly, there was no indication of fraudulent intent on the part of Alad II to escape liability for Alad I's debts. Furthermore, the *Ray* Court could not honestly find that there had been a consolidation or merger such as would impose liability on Alad II for injury resulting from Alad I's defective products. Finally, the "continuation of business" theory could not be relied upon as a liability-producing basis because under California law there existed no showing that one or both of the following factual requirements for a finding of continuation had been met: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; and (2) one or more persons were officers, directors, or stockholders of both corporations.

At this point it might appear that a finding of nonliability on the part of Alad II would have to follow as a matter of course. Not so. Implicit in the *Ray* case is that Court's strong sympathy for the injured plaintiff and its firm belief that if at all possible the injured party should recover something from somone. Thus, although *Ray* conceded that "the general rule governing succession to liabilities does not require Alad II to respond to plaintiff's claim", the Court set out to determine "the separate issue of what if any *special* rule should be applicable to a successor corporation's *tort* liability for its predecessor's *defective products*". 19 Cal 3d at 30. (Emphasis in original.)

The *Ray* Court analogized to the approach taken by the United States Supreme Court in determining whether an employer acquiring and continuing to operate a going business succeeds to the prior operator's obligations to employees and their bargaining representatives imposed by Federal labor law, noting that the Court refused to be bound by state law where its application would unduly thwart the public policies underlying the applicable labor law. The *Ray* Court stated that by analogy it was compelled to "decide whether the policies underlying strict tort liability for defective products call for a special exception to the rule that would otherwise insulate the present defendant from plaintiff's claim". *Id.*

After looking to California products liability cases which indicated that the purpose of products liability theory was to spread the costs of injuries resulting from defective products to the manufacturers which put the products on the market, rather than to the injured persons who are powerless to protect themselves, the Court remarked, p 31:

"Justification for imposing strict liability upon a *successor* to a manufacturer under the circumstances here presented rests upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." (Emphasis in original.)

Since the injury which gave rise to the plaintiff's claim in *Ray* did not occur until more than six months after the filing of the dissolution certificate of Alad I, it appears unlikely that plaintiff could have obtained a judgment against the dissolved Alad I under California corporation law. (See footnote 5, p 31). Also, the *Ray* Court argued that even assuming a judgment could be obtained against the dissolved Alad I, plaintiff would face "insuperable obstacles" in attempting to satisfy the judgment from Alad I's former stockholders or directors, and the Court also noted that the record did not disclose whether Alad I had insurance against liability on plaintiff's claim.

Faced with the distinct possibility of an injured plaintiff cut off from any source of recovery, the *Ray* Court quite understandably looked to Alad II and noted that the latter's acquisition of Alad I's name and operating assets had the further effect of transferring to Alad II the *resources* that had previously been available to Alad I for meeting its responsibilities to persons injured by defects in ladders which Alad I had produced. "These resources included not only the physical plant, the manufacturing equipment, and the inventories of raw material, work in process, and finished goods,

but also the know-how available through the records of manufacturing designs, the continued employment of the factory personnel, and the consulting services of Alad I's general manager. With these facilities and sources of information, Alad II had virtually the same capacity as Alad I to estimate the risks of claims for injuries from defects in previously manufactured ladders for purposes of obtaining insurance coverage or planning self-insurance. * * *. Moreover, the acquisition of the Alad enterprise gave Alad II the opportunity formerly enjoyed by Alad I of passing on to purchasers of new 'Alad' products the costs of meeting these risks." 19 Cal 3d at 33.

The Court concluded, p 34:

"Finally, the imposition upon Alad II of liability for injuries from Alad I's defective products is fair and equitable in view of Alad II's acquisition of Alad I's trade name, good will, and customer lists, its continuing to produce the same line of ladders, and its holding itself out to potential customers as the same enterprise. This deliberate albeit legitimate exploitation of Alad I's established reputation as a going concern manufacturing a specific product line gave Alad II a substantial benefit which its predecessor could not have enjoyed without the burden of potential liability for injuries from previously manufactured units. Imposing this liability upon successor manufacturers in the position of Alad II not only causes the one 'who takes the benefit [to] bear the burden' * * * but precludes any windfall to the predecessor that might otherwise result from (1) the reflection of an absence of such successor liability in an enhanced price paid by the successor for the business assets and (2) the liquidation of the predecessor resulting in avoidance of its responsibility for subsequent injuries from its defective products. (See *Turner v Bituminous Casualty Co, supra,* 397 Mich 406 * * *). By taking over and continuing the established business of

producing and distributing Alad ladders, Alad II became 'an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products' * * *.

"We therefore conclude that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired."

It appears to this Court that *Ray* either considered that Alad II continued Alad I's business in a de facto fashion and was therefore liable, or that in spite of the fact under California law there was no liability on the "continuation of business" theory the *Ray* Court presented an independent, alternative basis for placing liability in the instant case on Baker-Perkins.

It appears to this Court that Baker-Perkins could not have more effectively controlled Century, nor benefited more from the good will and continuation of its business, by any other method of corporate make-up than in the manner by which it did acquire Century. Is it too much to consider in the fast developing law of products liability to pierce the veil of this corporate transaction and reveal that Century after 1929 was actually Baker-Perkins? We think not. Under *Ray* it was accomplished. Under *Wilson* it was liberally construed under the continuation of business theory. Under *Turner* a traditional rule of law was disregarded in favor of the recognition of the facts in the case calling for possible liability.

We therefore reverse the trial court's summary judgment in favor of defendant herein.

This would ordinarily be a sufficient ruling to be

made by this Court on appeal of a products liability case. We deem there is more to be said.

Inasmuch as Century was an Ohio Corporation, it was and is subject to Ohio laws.

The Ohio statutes on corporations are applicable, and specifically Ohio Rev Code Ann § 1701.88, Winding up; powers and duties of directors:

"(A) When a corporation is dissolved voluntarily or when the articles of a corporation have been canceled or when the period of existence of the corporation specified in its articles has expired, the corporation shall cease to carry on business and shall do only such acts as are required to wind up its affairs, but for such purpose it shall continue as a corporation.

"(B) Any claim existing or action or proceeding pending by or against the corporation or which would have accrued against it may be prosecuted to judgment, with right of appeal as in other cases, but any proceeding, execution, or process, or the satisfaction or performance of any order, judgment, or decree, may be stayed as provided in section 1701.89 of the Revised Code."

This statute has been construed in the case of *Chadwick v Air Reduction Co, Inc,* 239 F Supp 247, 251 (ND Ohio, 1965), as follows:

"It is this Court's opinion that the intent of O.R.C. § 1701.88(B) is as follows:

" 'Any claim existing [not yet sued upon] or action or proceeding [already commenced] pending by or against the [dissolved] corporation or [any claim not yet sued upon or action or proceeding] which would have accrued against it [had dissolution not occurred] may be prosecuted to judgment, with right of appeal as in other cases * * *.'

"Under this Court's construction of the Ohio statute, plaintiff's claim may be brought against Gordon Armstrong Company, Inc. at this time. The inclusion of 'any claim' imposes a broader liability than merely for liabil-

ities incurred as a part of the winding up process, which construction is urged on behalf of defendant."

Under the ruling in *Chadwick* plaintiff's action against Century is still viable and remand is in order to permit plaintiff to add Century as a party defendant. The officers or directors of Century now serving Baker-Perkins may be served. If none are now acting, defendant may be served as sole beneficiary of the assets of Century upon its dissolution.

Reversed and remanded for further proceedings not inconsistent with this opinion.

Costs to plaintiff.