PELC v BENDIX MACHINE TOOL CORPORATION

Docket No. 51815. Submitted March 10, 1981, at Detroit.—Decided November 16, 1981.

Carol A. Pelc, individually and as administratrix of the estate of Gary P. Pelc, deceased, and as next friend of Jeffrey P. Pelc, a minor, brought a products liability action against Bendix Machine Tool Corporation in Oakland Circuit Court seeking to recover on theories of negligence, breach of implied warranty and failure to warn. The action arose out of an injury suffered by Gary Pelc in 1977 while he was operating a broaching machine which had been manufactured in 1943 by a company which was liquidated in bankruptcy in 1974. Michigan Special Machine, a subsidiary of Bendix Machine Tool Corporation, purchased approximately eight percent of the assets of the bankrupt company. The purchase allowed Special Machine, which was later merged into Bendix, to carry on the product line manufacturing of the bankrupt company. The trial court, James S. Thorburn, J., granted summary judgment in favor of defendant on the basis that the bankruptcy severed any successor liability on behalf of the purchasing corporation. Plaintiff appeals. *Held:*

1. Products liability may attach to a corporation which acquires the manufacturer of a product where the totality of the acquisition demonstrates a basic continuity of the enterprise between the manufacturer and the acquiring corporation. The totality of the transaction in this case does not demon-

REFERENCES FOR POINTS IN HEADNOTES

[1] 19 Am Jur 2d, Corporations § 1546.

[2] 19 Am Jur 2d, Corporations §§ 1546, 1549-1551, 1554, 1558.

[3, 4] 19 Am Jur 2d, Corporations § 1562.

63 Am Jur 2d, Products Liability § 5.

Products liability: liability of successor corporation for injury or damage caused by product issued by predecessor. 6 ALR3d 824.

[5] 63 Am Jur 2d, Products Liability §§ 4, 123.

Products liability: strict liability in tort. 13 ALR3d 1057.

[6] 63 Am Jur 2d, Products Liability §§ 42, 43.

Manufacturer's or seller's duty to give warning regarding product as affecting his liability for product-caused injury. 76 ALR2d 9.

strate the basic continuity of enterprise necessary to support a finding of successor liability.

2. A cause of action based on a successor corporation's breach of the duty to warn of known defects in the predecessor's products is independent of claims based on the theory of successor liability. Liability is imposed on a successor corporation for failure to warn of defects in products manufactured by its predecessor where some control over the product is given to the successor, as in servicing the predecessor's products, or the successor becomes aware of a defect in the product causing an assumption of liability by the successor for injuries thereafter caused by that product. Plaintiff has failed to establish that defendant serviced the machine in question or that defendant had knowledge of a defect in the machine prior to Pelc's injury. Summary judgment was therefore properly granted on this count.

3. Plaintiff's remaining issues are without merit.

Affirmed.

1. CORPORATIONS — SALE OF ASSETS — ASSUMPTION OF LIABILITIES.

The sale or transfer by a corporation of all its assets to another corporation generally does not bring with it liability for the liquidated or unliquidated debts, claims or liabilities of the selling corporation.

2. CORPORATIONS — SALE OF ASSETS — ASSUMPTION OF LIABILITIES.

The general rule is that if one corporation purchases the assets of another and pays a fair consideration therefor, no liability for the debts of the selling corporation exists in the absence of fraud or agreement to assume the debts; however, the purchaser may be held liable for the debts of the seller: (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

3. PRODUCTS LIABILITY — CORPORATIONS — SALE OF ASSETS — ASSUMPTION OF LIABILITIES.

Products liability may attach to a corporation which acquires the manufacturer of the product where the totality of the acquisition demonstrates a basic continuity of the enterprise between the manufacturer and the acquiring corporation, under these

guidelines: (1) there is a continuity of management, personnel, physical location, assets, and general business operations of the selling corporation; (2) the selling corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation; and (4) the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation.

4. PRODUCTS LIABILITY — CORPORATIONS — SALE OF ASSETS — ASSUMPTION OF LIABILITIES — ESTOPPEL.

A corporation which purchases another corporation is not estopped from denying liability for injuries caused by products manufactured by the purchased corporation merely because it has affirmatively held itself out to the world as the effective continuation of the purchased corporation; rather, this is but one factor to be balanced and weighed with other factors to determine if the totality of the transaction preponderates in favor of imposing successor liability.

5. PRODUCTS LIABILITY — STRICT LIABILITY.

Strict liability in product liability cases is not recognized as a theory of recovery in Michigan.

6. PRODUCTS LIABILITY — CORPORATIONS — SALE OF ASSETS — DUTY TO WARN.

A successor corporation may acquire an independent duty to warn where defects in a predecessor's products come to its attention; however, succession alone does not impose a duty to warn of recently discovered defects but, rather, liability is imposed on a successor corporation for failure to warn of defects in products manufactured by its predecessor where some control over the products is given to the successor, as in servicing, or the successor becomes aware of a defect in the product, causing an assumption of liability by the successor for injuries thereafter caused by that product.

*Bushnell, Gage, Doctoroff, Reizen & Byington* (by *Larry S. Baker),* for plaintiff.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.,* and *Gromek, Bendure & Thomas* (by *James G. Gross)* (of counsel), for defendant.

Before: V. J. BRENNAN, P.J., and M. J. KELLY and D. C. RILEY, JJ.

V. J. BRENNAN, P.J. Plaintiff, Carol Ann Pelc, individually and as administratrix of the estate of Gary P. Pelc, deceased, and as next friend of Jeffrey P. Pelc, appeals as of right from a grant of summary judgment in favor of defendant, Bendix Machine Tool Corporation.

This products liability case involves principles of successor corporate liability as impacted by an intervening bankruptcy. Essential to our resolution of the legal issues is the factual determination of whether the manner, quantity and quality of the acquisition by Bendix Machine Tool Corporation (Bendix) of the assets of Colonial Broach and Machine Company (Old Colonial) is sufficient to establish a prima facie case of successor liability so as to render Bendix potentially liable for the products liability claim against its predecessor. Hence, we set forth the factual context in considerable detail.

In October, 1977, Gary Pelc was injured while operating a broaching machine in the course of his employment with Massey-Ferguson. The broaching machine involved was manufactured in 1943 by Old Colonial, which had been liquidated in bankruptcy in 1974. Plaintiff filed her products liability action against Bendix as a successor corporation to Old Colonial, seeking to recover on theories of negligence, breach of implied warranty and failure to warn.

However, prior to the accident the following chronology of events had taken place.

The manufacturer of the machine, Old Colonial, had manufactured the machine in 1943. However, as of 1963, it ceased servicing the machine when it

sent parts and service manuals to another company which was rebuilding the machine. On December 19, 1973, Old Colonial filed a petition for voluntary arrangement under Chapter XI of the old bankruptcy act and its business operations were continued by the receiver for a short period. However, Old Colonial was soon forced into straight bankruptcy and a liquidation of assets soon began. At this point in time, all but a few of the 150-200 persons employed by Old Colonial were laid off. The retained employees stayed on to assist the receiver in the liquidation of assets. When it became publicly known that Old Colonial's assets were to be sold, a number of prospective purchasers expressed interest. Michigan Special Machine (Michigan Special) was one of those which expressed interest and eventually participated as a purchaser. Michigan Special was a subsidiary of Bendix and was merged into Bendix on October 1, 1977.

The bankruptcy court liquidated Old Colonial's assets by five major categories.

(1) Eagle Tool Division: This division of Old Colonial, located in Iron Mountain, Michigan, was sold for $250,000 to a group of investors from Iron Mountain;

(2) Accounts Receivable: The trustee collected $650,000 on Old Colonial's outstanding accounts receivable;

(3) Machinery and Equipment: By public auction, the trustee sold Old Colonial's equipment and machinery for $1,569,000. Bendix, via its subsidiary, Michigan Special, made limited purchases of $15,000 at this sale;

(4) Sale of Work in Process and Inventory: Various Old Colonial customers purchased Old Colonial's stock of inventory and work in process for

$579,650. In order to consummate transactions with certain purchasers, the trustee in bankruptcy arranged with the landlord of the Warren plant, previously occupied by Old Colonial, to allow assembly of certain of these machines on the premises. At least three of Old Colonial's former customers independently contracted with Michigan Special for it to complete assembly of their machines on Old Colonial's former premises at the Warren plant. Michigan Special charged these customers on a per diem plus material basis and, in turn, paid Old Colonial's trustee for use of the premises. Michigan Special started assembly of these machines in January, 1974, and completed assembly in October, 1974. During this interval of time, Michigan Special hired two of Old Colonial's ex-foremen but laid them off before completing the assembly of the machines. Also, during this time Michigan Special hired Mr. Unger, Old Colonial's chief engineer, who had been assisting the receiver in the liquidation of Old Colonial's assets;

(5) Drawings, Plans, Patents and Trademarks: In a letter of agreement, dated March 19, 1974, Michigan Special agreed to purchase from the bankruptcy estate all technical information and proprietary rights necessary to manufacture and market Old Colonial products. After the bankruptcy court's order approving the sale of these designated assets for $205,000, Michigan Special purchased all patents, trademarks and copyrights relating to Old Colonial products, technical information (including specifications, operating and maintenance manuals, technical reports, patterns, parts lists, material lists, all documentation and business records relating to Old Colonial products customer lists, vendor lists, etc.), rack cutters and hobs for mechanical drives, file cabinets with drawings in engineering, all sales catalogs, bro-

chures and other sales literature relating to Old Colonial products, and the exclusive right to use the name Colonial Broach and Machine Company. The agreement of sales between the bankruptcy estate and Michigan Special evinces an intent by the parties that these assets be sold free and clear of liens, claims and encumbrances.[1]

In total, the bankruptcy trustee recovered $3,059,457.76 for the sale of Old Colonial's assets. Of this total, Michigan Special paid $220,000, approximately 8% of the total amount recovered.

Thereafter, beginning in July, 1974, Michigan Special began producing its broach machines under the "Colonial" name. Later, these broach machines were identified as being produced by "Bendix-Colonial". In connection with the sales of machines, Michigan Special (and later Bendix) used the informational brochures that had been printed by Old Colonial. This literature of Old Colonial was given to defendant's customers and was also included in packets of materials given to purchasers of new machines. In 1978, defendant printed and distributed a sales brochure which identified itself as having been in the business of manufacturing broaching machines for the last 60 years.[2]

---

[1] The specific language was:

"free and clear of all known liens and encumbrances including, but not limited to, tax liens, liabilities for obtaining money under false pretenses, unscheduled claims, claims for breach of a fiduciary duty, wages and monies deposited by employees as security for the faithful performance of their duties * * *."

[2] The sales brochure stated:

*"WE'VE BEEN CUTTING OUR TEETH IN BROACHING FOR OVER 60 YEARS.*

"For well over one-half century Bendix Colonial Broach has been—and continues to be—the leader in research, development, and manufacturing of broaching machines and related equipment to serve every major producer of mass production parts throughout the world.

"Broaching has in the last half century risen from a relatively unknown production process to one of the most important in industry, due primarily to its prime characteristics:

As late as 1977, defendant listed the then defunct "Colonial Broach and Machine Company" in area telephone books without any indication of Bendix ownership.

Presently, defendant services the broaching machines it manufactures and, for a fee, it services and rebuilds those manufactured by Old Colonial; defendant does not service any other broach machines. Defendant produces service parts for Bendix-Colonial machines and for Old Colonial machines; defendant does not produce such parts for other broach machines. The record is undisputed that defendant has never had any actual dealings with the broaching machine which injured the decedent. It has never inspected, serviced or rebuilt the machine.

Finally, there was only one managerial employee of the Old Colonial company to be hired by Michigan Special, and he is now manager of the Colonial Group of Bendix. Between the time of Old Colonial's bankruptcy and commencement of this action, defendant has hired at least eight employees of Old Colonial, six of whom are still with defendant. However, no seniority rights or other benefits from their previous employment followed any of these employees.

On May 8, 1980, the trial court granted defendant's motion for summary judgment on the basis that the bankruptcy severed any successor liability[3] on behalf of the purchasing corporation.

The basic issue of this case is whether the

"(1) Ability to remove metal faster than any other comparable machining process.

"(2) Ability to produce machined surfaces and shapes to extremely high precision and finish."

[3] "The Court is of this opinion: That the motion for summary judgment should be granted. The reason is that obviously it was not the intention of the court in Michigan in *Turner* to continue or give a new cause of action, as it were, after an action in bankruptcy."

doctrine of successor corporate liability as delineated in *Turner v Bituminous Casualty Co,* 397 Mich 406; 244 NW2d 873 (1976), and its progeny is applicable to the factual context presented, that is: Should Bendix be held liable to plaintiff for injuries sustained from Old Colonial's allegedly negligently designed machine several years after Bendix's subsidiary Michigan Special purchased approximately eight (8) percent of Old Colonial's assets from a federal trustee in bankruptcy but the assets so purchased enabled Bendix to carry on the product line manufacturing of Old Colonial? In this particular factual context, we affirm the circuit court's finding of no liability.

Generally, under traditional corporate analysis, the sale or transfer of all its assets by one corporation to another does not bring with it liability for the liquidated or unliquidated debts, claims or liabilities of the selling corporation. The law on point and limited exceptions have been summarized as follows:

"The general rule is that, as in the instant case,

" '[I]f one corporation purchases the assets of another and pays a fair consideration therefor, no liability for the debts of the selling corporation exists in the absence of fraud or agreement to assume the debts.

\* \* \*

" 'There are certain instances, however, in which the purchaser or transferee may become liable for the obligations of the transferor corporation. The transferee may be held liable for the debts of the transferor corporation: (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5)

where the transferee corporation was a mere continuation or reincarnation of the old corporation.' (19 Am Jur 2d, Corporations, § 1546, pp 922-924; *Malone v Red Top Cab Co,* 16 Cal App 2d 268, 273 [60 P2d 543 (1936)].) *Schwartz v McGraw-Edison Co,* 14 Cal App 3d 767; 92 Cal Rptr 776; 66 ALR3d 808, 820-821 (1971)." *Turner, supra,* 417, fn 3.

In the seminal case of *Turner v Bituminous Casualty Co, supra,* our Supreme Court rejected the narrow strictures of traditional corporate successor nonliability as inapplicable to a products liability case. The *Turner* Court reasoned that the traditional corporate law approach was neither legally nor logically related to the policy considerations underlying the evolving law of products liability. Therefore, in its stead, the *Turner* Court adopted the rule of "continuity of enterprise" for products liability cases which arise subsequent to corporate transfers. The *Turner* Court held that products liability may attach to a corporation which acquires the manufacturer of the product where the totality of the acquisition demonstrates a basic continuity of the enterprise between the manufacturer and the acquiring corporation under these guidelines:

(1) There is a continuity of management, personnel, physical location, assets and general business operations of the selling corporation;

(2) The selling corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible;

(3) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations to the selling corporation; and

(4) The purchasing corporation holds itself out to

the world as the effective continuation of the seller corporation.

Applying the above four guidelines to the instant case, we are not convinced that the totality of the transaction demonstrates the basic continuity of enterprise as envisioned by *Turner.*

(1) There was no continuity of management, personnel, physical location, assets or general business operations. Bendix only hired one management-level employee and only hired about 8 of the 150 to 200 hourly personnel formerly employed by Old Colonial. Defendant never operated its business from Old Colonial's former plant except for the brief period of time when, at the bequest of the trustee, it assembled the three machines for former Old Colonial customers. Bendix purchased less than 8% of the assets sold by the bankrupt estate. Bendix neither purchased the accounts receivable nor assumed any of Old Colonial's contractual business agreements with its customers.

(2) Old Colonial did not cease its ordinary business operations, liquidate and dissolve *after* distribution of consideration received. Indeed, the converse was true. Old Colonial was in straight bankruptcy and, hence, in the process of being liquidated *prior* to defendant's purchase of its assets.

(3) Defendant did not assume any liabilities and obligations of Old Colonial ordinarily necessary for the uninterrupted continuation of Old Colonial's normal business operations. Old Colonial had already ceased its operations when defendant purchased its assets.

Under these three enumerated factors, we have no difficulty in concluding that there was an insufficient showing to impose successor liability on Bendix. However, the fourth and final factor is more troublesome.

(4) Bendix did hold itself out to the world as the effective continuation of Old Colonial. Bendix listed Colonial Broach and Machine Company in the telephone directory. The machines produced were labeled initially under the "Colonial" name and later under "Bendix-Colonial". Literature distributed to defendant's customers represented and identified defendant as being a continuation of Old Colonial. On the basis of this factor alone, plaintiff strenuously contends that successor liability must be placed on defendant since defendant is estopped from denying liability.

We are not so persuaded. While *Turner* and other cases applying the *Turner* doctrine have referred to the purchasing corporation as being estopped from denying liability when it has affirmatively held itself out to the world as the effective continuation of the seller corporation, none of the cases have justified imposition of liability solely upon this one factor. In *Trimper v Bruno-Sherman Corp,* 436 F Supp 349 (ED Mich, 1977) the court found both continuity of the enterprise between the predecessor and successor corporation *and* that the successor held itself out as the predecessor corporation as the bases for estopping the successor corporation from denying liability to innocent third parties. However, such cases do not stand for the proposition that estoppel provides an independent self-sufficient legal basis under *Turner* for finding vicarious liability. Our examination of the cases cited in *Turner* for this proposition does not convince us otherwise. *Ray v Alad Corp,* 19 Cal 3d 22; 136 Cal Rptr 574; 560 P2d 3 (1977), *Ortiz v South Bend Lathe,* 46 Cal App 3d 842; 120 Cal Rptr 556 (1975) (FLEMING, J., *dissenting).* Rather it is but one factor to be balanced and weighed with the other factors to determine if the

totality of the transaction preponderates in favor of imposing successor liability. On balance it does not. See, generally, Comment, *Products Liability: Developments in the Rule of Successor Liability for Product-Related Injuries,* 12 U Mich J L Ref 338 (1979).

Basically, plaintiff is requesting that this Court discard the "continuity of enterprise" analysis established in *Turner* for determining successor liability in favor of the even broader "product line" analysis developed by the California Supreme Court in *Ray, supra.* There are fundamental analytical and policy differences between the *Turner* "continuity of enterprise" approach and the *Ray* "product line" approach.[4] While *Turner* incorporates into its guidelines traditional corporate principles, *Ray* completely abandons such traditional rules in favor of the policy underlying strict tort liability for defective products.

"Whereas the *Turner* variation on continuation of the enterprise contemplates such factors as the ownership and management of the successor's corporate entity, its personnel, physical location, assets, trade name, and general business operation, the *Ray* test is concerned not with the continuation of the corporate entity as such but rather with the successor's undertaking to manufacture essentially the same line of products as

[4] The distinction between these two approaches can be best understood by examining the cases applying the two doctrines. For illustrative cases applying the "continuity of enterprise" doctrine: *Powers v Baker-Perkins, Inc,* 92 Mich App 645; 285 NW2d 402 (1979), lv den 409 Mich 851 (1980), *Haney v Bendix Corp,* 88 Mich App 747; 279 NW2d 544 (1979), *Korzetz v Amsted Industries, Inc,* 472 F Supp 136 (ED Mich, 1979), *Trimper v Harris Corp,* 441 F Supp 346 (ED Mich, 1977), *Trimper v Bruno-Sherman Corp,* 436 F Supp 349 (ED Mich, 1977).

For illustrative cases applying the "product line" doctrine: *Gee v Tenneco, Inc,* 615 F2d 857 (CA 9, 1980), *Ray v Alad Corp,* 19 Cal 3d 22; 136 Cal Rptr 574; 560 P2d 3 (1977), *Rawlings v D M Oliver, Inc,* 97 Cal App 3d 890; 159 Cal Rptr 119 (1979), *Ramirez v Amsted Industries, Inc,* 86 NJ 332; 431 A2d 811 (1981).

the predecessor." *Ramirez v Amsted Industries, Inc,* 86 NJ 332; 431 A2d 811, 819 (1981).

We decline plaintiff's invitation to jettison the confines of the *Turner* analysis and adopt the more expansive "product line" theory of liability. Our decision is buttressed by two primary considerations. First, the Supreme Court had the *Ray* case before it when it decided *Turner.* Although there is no doubt that the *Turner* Court was greatly influenced by the legal reasoning set forth in the *Ray* opinion, it nevertheless specifically set forth its own criteria establishing "continuity of enterprise" for determining successor liability. Second, the *Ray* doctrine is grounded in strict liability for product defects; theoretically it requires no showing of fault. Michigan has not yet openly embraced strict liability as a theory of recovery for products liability. *Phillips v J L Hudson Co,* 79 Mich App 425, 427; 263 NW2d 3 (1977), *Johnson v Chrysler Corp,* 74 Mich App 532; 254 NW2d 569 (1977), *Dooms v Stewart Bolling & Co,* 68 Mich App 5; 241 NW2d 738 (1976), *lv den* 397 Mich 862 (1976). Hence, we conclude that our continued adherence to the doctrine of successor liability as evaluated by all four guidelines set forth in *Turner* will, in the long run, assure a uniform evolution of this area of the law most consistent and harmonious with the law and policy considerations of our jurisdiction.

In light of our disposition of the successor corporate liability issue, we find it unnecessary to address the applicability of the Supremacy Clause of the United States Constitution as affecting defendant's liability for subsequent tort claims when the assets are purchased from a federal trustee in a federal bankruptcy proceeding.

Independent of the claim of successor liability,

plaintiff next contends that defendant breached its duty to warn users of machines which were manufactured by Old Colonial.

In *Gee v Tenneco, Inc,* 615 F2d 857, 866 (CA 9, 1980), the court stated that:

"It is clear that a successor corporation may acquire an independent duty to warn where defects in a predecessor's products come to its attention. See *Leannais v Cincinnati, Inc,* 565 F2d 437 (CA 7, 1977); *Shane v Hobam, Inc,* 332 F Supp 526 (ED Pa, 1971); *Wilson v Fare Well Corp,* 140 NJ Super 476; 356 A2d 458 (1976). It is equally clear, however, that succession alone does not impose a duty to warn of recently-discovered defects. See *Travis v Harris Corp,* 565 F2d 443 (CA 7, 1977); *Chadwick v Air Reduction Co,* 239 F Supp 247 (ND Ohio, 1965).

"A common thread running through decisions imposing a duty to warn upon a successor corporation has been the continuation of the relationship between the successor and the customers of the predecessor. In *Shane,* and *Fare Well Corp,* both *supra,* the successor had inherited service contracts which included responsibilities for servicing the allegedly defective product. In *Leannais, supra,* the court reversed a summary judgment in the successor's favor and remanded for determination whether the successor had assumed the predecessor's service contract, among other issues. The rationale of these decisions is consistent with a benefit/burden analysis, and also imposes a burden which the manufacturer can realistically bear.

"In *Travis v Harris Corp, supra,* the Seventh Circuit declined to impose a duty to warn where evidence of a continuing relationship between customer and successor was lacking. Citing its earlier decision in *Leannais,* the court noted that:

" 'Succession to a predecessor's service contract, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, a purchaser corporation's knowledge of defects and of the location or owner of that machine, are factors which may be considered in determining the presence

of a nexus or relationship effective to create a duty to warn. 565 F2d 443, 449.' "

In *Powers v Baker-Perkins, Inc,* 92 Mich App 645; 285 NW2d 402 (1979), *lv den* 409 Mich 851 (1980), this Court adopted the position that under some circumstances there can be a cause of action based on a successor's breach of the duty to warn. This cause of action is independent of claims based on the theory of successor liability. *Id.,* 661-663, *Wilson v Fare Well Corp,* 140 NJ Super 476, 491; 356 A2d 458 (1976). *Powers, supra,* 662-663, would impose liability on a successor corporation for failure to warn of defects in products manufactured by its predecessor "when some control over the product is given to the successor, as in servicing, or the successor becomes aware of a defect in the product, causing an assumption of liability by the successor for injuries thereafter caused by that product". See also *Shane v Hobam, Inc,* 332 F Supp 526 (ED Pa, 1971).

In the instant case, defendant admits that through its machine history records it had constructive knowledge of the existence of the broach machine on which Gary Pelc was injured. However, there is nothing in the record to indicate that defendant had serviced the machine in question or had any control over it. There is also no indication that defendant or any employee of defendant, including Uber, was aware of any defect in this machine prior to Gary Pelc's injury. Because plaintiff has failed to establish that defendant serviced the machine in question or that defendant had knowledge of a defect in the machine prior to Pelc's injury, summary judgment with regard to this count was proper. *Powers, supra.*

We have examined plaintiff's remaining issues

and find them to be without merit. While neither the motions presented by defendant nor the judgment rendered by the court specified which subrule of GCR 1963, 117 was being relied upon, we are unpersuaded that plaintiff was surprised, misled or prejudiced by this omission. *Todd v Biglow,* 51 Mich App 346; 214 NW2d 733 (1974), *lv den* 391 Mich 816 (1974).

Finally, since plaintiff failed to cite any authority in support of its argument that a grant of summary judgment is improper in an area of newly evolving law, we deem this issue to be abandoned on appeal. *Stanek v Bergeon,* 89 Mich App 283, 285; 279 NW2d 296 (1979), *Kucken v Hygrade Food Products Corp,* 51 Mich App 471; 215 NW2d 772 (1974).

The grant of summary judgment in favor of defendant is affirmed.