Linda **KORZETZ**, Plaintiff,

v.

**AMSTED INDUSTRIES, INC.,** and
**Positive Safety Manufacturing
Company, Defendants.**

**Civ. A. No. 77–70889.**

United States District Court,
E. D. Michigan, S. D.

Jan. 10, 1979.

Joseph R. Brom, Detroit, Mich., for plaintiff.

Mark D. Willmarth, Vandeveer, Garzia, Tonkin, Kerr & Heaphy, P. C., Detroit, Mich., for defendant Amsted.

## OPINION

JULIAN ABELE COOK, Jr., District Judge.

### Regarding Defendant Amsted's Motion for Summary Judgment

Defendant, Amsted Industries, Inc. [hereinafter Amsted] seeks to be summarily dismissed from this case. The substance of this Motion is that Amsted did not succeed to liabilities arising out of injuries sustained by presses manufactured by the Johnson Machine and Press Company [hereinafter Johnson].

In its Motion, the basic history of Amsted's relationship to Johnson is laid out. (1) The press causing the injury to the Plaintiff was manufactured by Johnson sometime in 1950; (2) Johnson sold all of its assets to Bontrager Construction Company [hereinafter Bontrager], an Indiana Corporation, and Bontrager assumed all of its liabilities in a stock for stock transaction on September 1, 1956; (3) Johnson did not dissolve but rather continued its corporate shell owning no property and having only one (1) share outstanding to maintain its corporate existence; (4) on August 29, 1962; Amsted purchased all of the assets of Bontrager (including the one share of Johnson stock) for cash, but assumed only some of the liabilities; (5) Bontrager continued to exist for almost two (2) years after the 1962 sale of assets for cash.

1. 28 U.S.C. § 1332(a)(1) (1975).

2. *Klaxon v. Stentor Elec. Mfg.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

3. *Day & Zimmerman, Inc. v. Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975).

## I. CONFLICT OF LAWS

■ We must first consider the conflict of laws problem that this Motion and this case present before analyzing the substantive issues which are ancillary to successor liability. Jurisdiction in this case comes to us by diversity of citizenship of the parties.[1] It has long been established that a Federal Court sitting in diversity is required to apply the conflict of laws of the forum jurisdiction.[2] As inflexible as the rule seems, the Court has recently reaffirmed the *Klaxon* Doctrine.[3] Therefore, Michigan conflict rules apply as the movant contends.

### A. Characterization

■ Movant contends that the conflict rule to be applied is *lex loci contractus* because we are attempting to determine the rights and liabilities of a party to a contract, i. e., the 1962 purchase agreement between Bontrager and Amsted. The movant states, "[i]t is important to point out that the law which is applicable to one issue of a lawsuit need not apply to the other issues in that lawsuit. We are not discussing which theories of liability a Plaintiff may use against a particular Defendant. *Abendschein v. Farrell,* 382 Mich. 510, 170 N.W.2d 137 (1969)."[4] This is an interesting and novel approach. We are asked to resolve conflict issues by picking and choosing law from various jurisdictions based upon a conflict rule relevant to a given issue. Consequently, under this approach, a given case could require the application of the substantive law of one, two or several jurisdictions. Such a fragmented analysis would not only prove cumbersome[5] but seem also to contravene one of the purposes of conflict rules; to wit, to apply the substantive law of the relevant jurisdiction to the claims of a Plaintiff arising out of a given factual

4. Brief for Defendant Amsted at 2.

5. *See* Restatement (Second) of Conflicts Laws § 6, Comment j (1971) [hereinafter Restatement].

construct. This is why the characterization of a claim as tortious, contractual or some other legal theory can be very important.[6]

The Restatement (Second) of Conflicts does give some support to the issue oriented methodology which has been suggested by the movant. "The courts have long recognized that they are not bound to decide all issues under the local law of a single state."[7] Nevertheless, the Restatement gives examples of this bifurcating mode of analysis and all deal with separating the case along, what might loosely be referred to as, procedural/substantive lines. "[A] court under traditional and prevailing practice applies its own state's rules to issues involving process, pleadings, joinder of parties, and the administration of the trial . . . while deciding other issues . . . by reference to law selected by application of the rule stated in this chapter [§ 145]."[8] This reading of the Restatement may not, and cannot be, dispositive as to what the American Law Institute intended to do, or it would do with the conflict problem which has been presented by the successor liability issue in product cases. However, as to that precise issue, the Restatement is silent, and we are left with the task of determining if this bifurcation in characterizing the conflict problem is appropriate or permitted.

Even if the Restatement were not silent on this issue of bifurcation, as a Federal Court sitting in diversity, we would be bound to determine questions of characterization in accordance with Michigan Law.[9]

Our inquiry, therefore, leads us to ask whether Michigan has characterized issues of successor liability as contractual and issues of ultimate liability as tortious, and/or if Michigan has deferred characterization questions to the forum jurisdiction as suggested by the Restatement.[10]

■ No Michigan case has utilized the two-pronged conflict analysis which has been suggested by the movant. However, a case from the Western District of Michigan does give some support to movant's claim.[11] There the Court applied New Jersey law because the transfer of assets and the focus of manufacturing operations occurred in New Jersey, albeit the injury occurred in Michigan. Although we are required to give serious consideration to rulings of other U.S. District Courts,[12] *Shannon* is troublesome because it (a) reaches the conclusion to apply New Jersey law without conflict analysis, and (b) was decided before, and therefore, not in contemplation of, *Turner v. Bituminous Casualty Co.*[13]

In *Turner,*[14] the contract which transferred the assets of the predecessor to the successor corporation was apparently executed outside of Michigan. Michigan applied (and created) its own law regarding successor liability. However, the conflict issue of characterization was not precisely before it. The reported opinion nowhere speaks of the Defendant pleading in the Supreme Court or below the application of New York or any other state law. It is noteworthy that the Michigan Supreme Court applied its own products liability law when, had the problem been characterized as contractual, some other jurisdiction's law

---

6. *See id.* § 7, Comment b.

7. *Id.* § 145, Comment d.

8. *Id.*

9. *E.g., Brooks v. Eastern Airlines, Inc.* 253 F.Supp. 119, 121 (N.D.Ga.1966). *See* Restatement § 7, Comment f. *Cf. Reconstruction Fin. Corp. v. Beaver County,* 328 U.S. 204, 210, 66 S.Ct. 992, 90 L.Ed. 1172 (1946) (where the Court utilized a state law characterization of what was and was not real property for purposes of a federal statute).

10. Restatement § 7(2).

11. *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 800 (W.D.Mich.1974).

12. *Bernhardt v. Polygraph Co.,* 350 U.S. 198, 204, 76 S.Ct. 273, 100 L.Ed. 199 (1956); *MacGregor v. State Mut. Life Ins. Co.,* 315 U.S. 280, 281, 62 S.Ct. 607, 86 L.Ed. 846 (1942); 1A part 2, J. Moore, Federal Practice & Procedure ¶ 0.309[2] & n. 28 [hereinafter Moore's].

13. 397 Mich. 406, 244 N.W.2d 873 (1976).

14. The fact that *Turner* is a plurality decision in no way alters our obligation to follow it if we find it dispositive.

of successor liability may have been relevant. Nevertheless, their silence regarding conflict of laws is deadening for our purpose of determining whether the Michigan Supreme Court has directly and dispositively dealt with such questions of characterization.

■ When a Federal Court determines that no state decision is on point, it is obligated to follow consider dicta, related decisions, analogies and other reliable data which tends to indicate what the state law is.[15] We must turn our focus again to *Turner* (the most recent Michigan decision dealing with successor liability) to see if it illuminates the disposition of the Michigan Court as to characterization.

*Turner* reflects the inclination of the Michigan Supreme Court to refuse to "pigeon hole" successor liability in the products cases into traditional contract oriented analysis.

> [D]efendants reliance on this so called "general rule of nonliability" whereby, with certain limited exceptions, the purchasing corporation is not liable for obligations of the transferor corporation, is inapposite. That rule developed not in response to products liabilities problems, but largely in the area of creditors protections.
>
> . . . Further, case law that developed to protect rights of creditors and minority shareholders, in all probability is not applicable to meeting the substantially different problems associated with products liability.[16]

In view of such language and, perhaps, the underlying desire to develop a separate jurisprudence of products liability—which is neither tied to tort or contract notions—it is difficult to envision the Michigan Supreme Court adopting the novel approach (as suggested by movant) of characterizing the successor liability issue as contractual and applying *lex loci contractus.*

Even if we were not to read *Turner* as binding upon us for purposes of determining if the question should be characterized as contractual, there is Michigan precedent indicating that questions of characterization are deferred to the forum jurisdiction. In *Waldron v. Armstrong Rubber Company,* the Court found that the nature of the action involved was to be characterized by the law of the forum.

> The questions thus refined becomes whether the nature of the action is characterized by the law of the forum (Michigan) or the law of the place of the injury (Indiana). . . . we hold that, to the extent that characterization is necessary to determine which of two arguably applicable foreign statutes of limitations governs, as a procedural matter, the law of Michigan applies. Accordingly, plaintiffs' cause of action for breach of warranty sounded in tort and the two year Indiana statute of limitations barred suit.[17]

The Michigan Supreme Court reviewed, and remanded, *Waldron.*[18] However, the Supreme Court did not address the Court of Appeals discussion of characterization but merely stated that they had erred in applying Michigan, rather than Indiana law. The Michigan Supreme Court cited, without comment, an important and innovative New Jersey case,[19] which abandoned the common law conflict rule that statutes of limitation are ordinarily procedural and thereby controlled by the law of the forum rather than by the law of the state which otherwise governs the cause. In light of the *Heavner* citation, we do not read the Michigan Supreme Court's remand of *Waldron* as holding erroneous the considered dicta of the

---

15. See 1A part 2, Moore's Federal Practice ¶ 0.0307[2] & nn. 45–47.

16. *Turner v. Bituminous Cas. Co.,* 397 Mich. at 417–18, 244 N.W.2d at 877–78.

17. *Waldron v. Armstrong Rubber Co.,* 54 Mich. App. 154, 158–59, 220 N.W.2d 738, 740–41 (1974).

18. *Waldron v. Armstrong Rubber Co.,* 393 Mich. 760, 223 N.W.2d 295 (1974).

19. *Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 305 A.2d 412, 415–18 (1973).

Michigan Court of Appeals that characterization should be a matter for the forum jurisdiction. Indeed, the Michigan Supreme Court, *sub rosa,* and the *Heavner* court expressly, had to characterize the statutes of limitations involved as substantive before deferring to some other jurisdictions statute of limitations. It was the classification of the statutes of limitations as procedural—a classification not questioned by the Michigan Court of Appeals—that proved erroneous.

 As mentioned earlier, considered dicta is to be given great weight in ascertaining what is the local law; also, the rulings of intermediate state courts is binding upon Federal Courts sitting in diversity.[20] We, therefore, feel compelled to follow the Michigan Court of Appeals' statement in *Waldron* that characterization of actions should be made in accordance with the law of the forum jurisdiction.[21]

We are the forum jurisdiction in this lawsuit, and, therefore, characterization of the successor's product liability as tortious or contractual would be for us to determine in the event that we did not read *Turner* as dispositive on this issue.[22]

By characterizing successor liability as a contract problem, it seems that much is overlooked. Products liability is in its infant stage of jurisprudential development. Certainly, like any expression of law, it is bound to develop out of thoroughly established principles. It does not arise *ex nihilo* or escape the inexorability of historical ties. Nevertheless, while products liability is both contract and tort, it is neither. It is straining to be independent of, or at least not totally identified with, its established and well furrowed forerunners. Discussion of products liability invariably brings reference to spreading the risk and other concepts more familiar to insurance than torts or contracts. To characterize the issue as contractual seems parched, a lifeless analysis that fails to conform the law to reality. To ground in contract questions of successor liability, whether for conflict of laws purposes or simply to settle questions of substantive law, would give support to the proposition that the party who benefited from the bargain can escape liability even though the party who transferred the benefit would have been liable had not the contract been consummated. Recognition of such freedom of contract notions and, moreover, recognition of such powers of contract without regard to their consequential effects upon innocent parties, who neither know of, or are in any way related to, the contract, are better left in the nineteenth century. This is not to say that contract

---

20. *West v. American Telegraph & Telephone Co.,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

21. This is the same rule adopted by the Restatement § 7(2).

22. Michigan, in deferring to us as the forum jurisdiction, presents an interesting and baffling problem somewhat analogous to the *renvoi* problem of conflict of laws.
 Michigan defers characterization to us; *Klaxon* requires we apply Michigan conflict of laws. Are we thereby required, by *Klaxon,* to return again to Michigan law? Fortunately, the question is of no consequence here because the result is the same whether *Klaxon* applies or not.
 If we assume *Klaxon* requires such re-referral to Michigan law and assume, as we did above, that *Turner* is not controlling, we find that Michigan law is silent as to how the successor liability issues should be characterized. We then would be required to determine, as we attempted earlier, to anticipate how the Michigan courts would rule on such a question. If *Turner* is helpful in determining how the Michigan court would rule, then our inquiry would end. We would be forced to hold that Michigan would not characterize the issue as contractual. *See* discussion *supra.* If we did not find *Turner* helpful then the inquiry would have to continue. Therefore, given that (a) *Turner arguendo,* is of no assistance, and (b) the entire area of successor liability in products cases is one of first impression in Michigan, *Turner v. Bituminous Cas. Co.,* 397 Mich. at 418, 244 N.W.2d at 878, we can safely conclude no Michigan decisions, considered dicta, analogies, or other data is in any way relevant to ascertaining what this characterization would be under Michigan law. Consequently, we would then be free to characterize this question as we saw fit.
 Alternatively, we would be free to characterize the question as we saw fit were we to determine *Klaxon* inapplicable at this stage of our analysis.

ideas should not influence the law of successor liability in products cases; indeed, they permeate the "general rule" mentioned in *Turner* and followed by most courts. Even under *Turner,* consideration of the contractual relations between the transferring parties plays a part in determining the existence of continuity of interest, the loadstone in finding successor liability under that case's approach. We feel it would be insensitive, inappropriate and backward to characterize the issue as contractual for purposes of selecting the proper conflict rule, and thereby, the law of the proper jurisdiction. We would only uselessly tie this aspect of products liability law into contract thinking.[23]

 This Court therefore, reaches the same conclusion, by virtue of our own reasoning, as we would have made had there been an explicit finding that *Turner* prohibits characterizing the successor's product liability as contractual under movant's bifurcated methodology.

Having rejected the movant's suggestion, we are left with only the tortious characterization in this case. This conflict's characterization is clearly in line with Michigan precedents.[24] Accordingly, this Court is required to follow them.[25]

## B. Choice of Law

As movant points out, the controlling conflict rule in Michigan regarding actions classified as tortious is *lex loci delicti.* Although the rule was under severe criticism a few years ago, the Michigan Supreme Court reaffirmed it.[26] It appears now, however, that the Michigan Supreme Court is questioning its universal applicability.[27] In *Sweeney* the court concluded that Michigan had a strong public policy permitting intrafamily suits. Application of Ohio intrafamily immunity under *lex loci delicti* would inhibit and defeat that policy, and therefore, the Court concluded the rule should not there be utilized under such circumstances. However, they expressly stated, "[w]hether *lex loci delicti* should be applied in other situations is not decided here."[28] It appears that Michigan will determine on an *ad hoc* basis when *lex loci delicti* will cease to be used.

 In *Hill v. Clark Equipment,*[29] the Michigan Court of Appeals reiterated the applicability of *lex loci delicti* to products liability cases. It also held that the place of wrong was the situs where the injury was sustained and not where the defective product was manufactured. They attached their unpublished opinion of December 9,

---

**23.** *See Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir. 1977). The court refused to apply the law of the state where the parties contracted even though the litigants stipulated to such application and the district court agreed. Rather the court opted for application of the law of the situs of the injury.

> [Al]though the contract may be interpreted under Ohio law, the legal effect of that agreement, and questions of traditional tort law unrelated to the contract, are to be determined in accord with the laws of Indiana, the situs of the injury and domicile of Travis.

**24.** *Hill v. Clark Equip. Co.,* 85 Mich.App. 1, 2–3, 270 N.W.2d 722, 723 (1978) (on rehearing); *Turner v. Ford Motor Co.,* 81 Mich.App. 521, 527–28, 265 N.W.2d 400, 403–04 (1978); *Hill v. Clark Equip. Co.,* 42 Mich.App. 405, 407, 202 N.W.2d 530, 531 (1972).

**25.** It would seem that special conflict rules particularly suited to products liability should and inevitably will be developed. Such rules should be free of contract or tort characterizations. The successor liability problem points to the need for such a rule or set of rules custom tailored to products liability cases. Unfortunately, because the Michigan courts have characterized products liability actions as tortious, we are obliged to follow *lex loci delicti.* In considering the successor liability problem, one Federal District Court has utilized the forum state's "significant contacts" rule (a rule similar to the Restatement's "most significant relationship" approach) in determining which of several jurisdictions' laws should be applied. *Lopata v. Bemis Co.,* 406 F.Supp. 521, 522–24 (E.D.Pa.1975).

**26.** *Abendschein v. Farrell,* 382 Mich. 510, 170 N.W.2d 137 (1969).

**27.** *Sweeney v. Sweeney,* 402 Mich. 234, 262 N.W.2d 625 (1978).

**28.** *Id.* at 242, 262 N.W.2d at 628.

**29.** *Hill v. Clark Equip. Co.,* 85 Mich.App. 1, 270 N.W.2d 722 (on rehearing).

1977, as an appendix for the purpose of preserving the issue of applicability of *lex loci delicti* in products cases for review. In view of the holding in *Hill* and the fact that *Sweeney* was limited to its own facts, *Klaxon* mandates we apply *lex loci delicti*. Similarly, we are required to find that the place of the wrong is where the injury was sustained. This Court, therefore, will apply Michigan law to this Motion.

## II. SUBSTANTIVE ISSUES

Our inquiry once again leads us back to *Turner*. It is for us to determine whether Amsted can be held liable under Michigan law (as announced in *Turner*) for injuries sustained by presses which were manufactured by Johnson before Johnson was acquired by Bontrager and, therefore, before Bontrager was acquired by Amsted.

Defendant movant expresses several reasons, both factual and legal, why we should not find *Turner* applicable. We address those worth noting seriatim.

■■ First, Defendant reads *Turner* as creating a "new exception of continuity" to the "traditional" or "general rule" of successor liability, as creating "merely a modification" of this "traditional rule." This is a narrow, strained and incorrect reading of the case. The Court expressly found that the "general rule" was inappositely invoked in a products liability context and that the law of successor liability in such a context should be determined by reference to products liability law.[30] *Turner* refused to distinguish between a purchase of assets for stock and a purchase of assets for cash because it determined that continuity of enterprise, irrespective of how effectuated, was the gravamen of successor liability. "Continuity is the purpose, continuity is the watch word, continuity is the fact." [31]

The Court offered some help in ascertaining the existence of continuity of interest by referring to selected criteria enumerated in two other cases:

As a consequence, we adopt the rule that in the sale of corporate assets for cash, the first, third and fourth criteria set forth in the *Shannon [v. Samuel Langston Co.,* 379 F.Supp. 797] quotation from *McKee [v. Harris-Seybold Co.,* 109 N.J. Super. 555, 264 A.2d 98] shall be *guidelines* to establish whether there is continuity between the transferee and transferor corporation.[32]

Those criteria are:

(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operation.

(3) The seller corporation ceases its ordinary business operations, liquidates, dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.[33]

■■ Defendant's reading of these criteria as ironclad elements, each and every one of which must be present to find successor liability, appears to be misplaced. They are only guidelines.

These reasons lead us to believe that the first, third and fourth criteria quoted in *Shannon* from *McKee* as tests of continuity of interest, and therefore responsibility, *are all relevant,* with first as perhaps of greatest significance.[34]

We therefore read *Turner* as establishing a type of sliding scale in determining the

---

**30.** *Turner v. Bituminous Cas. Co.,* 397 Mich. at 416–18, 244 N.W.2d at 877–79.

**31.** *Id.* at 426, 244 N.W.2d at 882. We note also that Michigan recognized that the bulk of the burden for defective products is better borne by the manufacturer than by the consumer. *Id.* at 424, 244 N.W.2d at 881.

**32.** *Id.* at 430, 244 N.W.2d at 883 (emphasis added).

**33.** *Id.* at 420, 244 N.W.2d at 879.

**34.** *Id.* at 429, 244 N.W.2d at 883 (emphasis added).

existence of continuity of interest. The fact that the transferor is not dissolved immediately or does not assume all liabilities ordinarily necessary for uninterrupted continuation of normal business operations, does not conclusively establish discontinuity of interest when there is other strong and convincing evidence of continuity of enterprise.

In this case, we will believe such strong and convincing evidence exists. Amsted purchased all of Bontrager's assets: plants, lands, designs, inventories, work in progress, patents, trademark, and customer lists. Also, sales representative contracts were to be maintained as well as other then existing contracts; Amsted secured a covenant not to compete for five years from Bontrager's shareholders; Bontrager was to maintain inventory supplies in accordance with prior practice, and real property was transferred with the stipulation that it was to be used for continuing operations; Amsted was to make best effort to take on all of Bontrager's employees with the exception of three management level personnel. We believe this evidence convincingly establishes the type of relationship or continuity of interest envisioned by *Turner.*

Nevertheless, Defendant maintains there is significance in the fact that there was no continuation of the transferor's corporate name. Defendant argues that because the name was not continued, there is not the same type of representation to the whole world of continuity as was involved in *Turner.* Plaintiff submits exhibits indicating that Amsted represented its presses as "Johnson Presses" in advertising campaigns. "The whole world" that actually or constructively searched the Indiana Secretary of State's Office may have been notified that the official corporate names "Johnson" or "Bontrager" were not continued by Amsted, but the world of the marketplace continued to see and rely upon the name "Johnson Press." After the acquisi-

tion of Bontrager, the pointing out by Amsted to its customers that its division (South Bend Lathe)—and not Bontrager— was manufacturing Johnson presses further supports the idea that Amsted was attempting to exploit the Johnson goodwill, name, and market.

> Where the successor corporation represents itself either affirmatively or, by omitting to do otherwise, is in effect a continuation of the original manufacturing enterprise, a strong indication of continuity is established. Justice would be offended if a corporation which holds itself out as a particular company for the purpose of sales would not be estopped from denying that it is that company for the purpose of determining products liability.[35]

Next, Defendant-Movant points out that (a) Bontrager continued to exist for over two years after the sale of assets to Amsted, (b) that Amsted is "twice removed" from Johnson (i. e., Amsted purchased from Bontrager who purchased from Johnson) and is thereby not liable, and (c) that Amsted's refusal to assume liabilities for breach of warranties on these machines evidences a break in the ordinary business operation of the seller's business.

We think the evidence of continuation is strong and convincing enough to establish successor liability even if we perceive each of these contentions as rebutting continuity. Nevertheless, we point out that *Turner* only requires that the transferor eventually become defunct.[36] Moreover, it has been held that a transferee can be held liable under *Turner* notwithstanding the fact that the transferor continues to exist but operates in other fields.[37] The fact that Bontrager maintained a continued, but inert corporate existence for two years after the transfer is of no real import under the *Turner* rationale.

Similarly, Amsted's twice removed status (vis-a-vis Johnson) does not appear to be

---

**35.** *Id.* at 426, 244 N.W.2d at 882.

**36.** *Id.* at 429, 244 N.W.2d at 883.

**37.** *See Trimper v. Bruno-Sherman Corp.,* 436 F.Supp. 349, 350 (E.D.Mich.1977) (Churchill, J.).

legally significant. Amsted continued the business that Johnson established. That fact was in no way negated by Bontrager "picking up the ball" from Johnson and then "passing it" to Amsted.

The liability attaches to the business like fleas to a dog, where it remains imbedded regardless of changes in ownership of the business. So long as the business retains its distinct identity and character and continues to be operated as it has in the past, defective products liability adheres to the business.[38]

Finally, even if Amsted's failure to assume Bontrager's warranty obligations on the Johnson machines establishes that there was a discontinuity in the normal business operations of Bontrager (which seems unlikely in view of all the other evidence), such evidence in no way rebuts the continuity of interest established.

Accordingly, defendant Amsted's motion for summary judgment is denied.

---

**38.** *Ortiz v. South Bend Lathe,* 46 Cal.App.3d 845, 851, 120 Cal.Rptr. 556, 561 (1975) (Moss, J., dissenting). *See also Trimper v. Harris Corp.,* 442 F.Supp. 346, 347 (E.D.Mich.1977) (Churchill, J.); *Trimper v. Bruno-Sherman Corp.,* 436 F.Supp. 349.