Cynthia M. NEAGOS and Emil Neagos, Plaintiffs,

v.

VALMET–APPLETON, INC., formerly known as Appleton Machine Company, Sales Corporation, a Wisconsin Corporation, Chicago Curdworth Service Company, Inc., formerly known as Cleereman Machine Tool Company, a Division of Appleton Machine Company, Sales Corporation, an Illinois Corporation, Defendants.

No. 91–CV–70035–DT.

United States District Court, E.D. Michigan, S.D.

April 24, 1992.

---

Jeremiah J. Kenney, Kitch, Saurbier, Drutchas, Detroit, Mich., for plaintiffs.

Timothy Wittlinger, Hill Lewis, Detroit, Mich., for defendant Valmet–Appleton, Inc.

Loretta M. Ames, Plunkett Cooney, Detroit, Mich., for defendant Chicago Curdworth Service Co., Inc.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

This products liability action is before the Court on the basis of diversity jurisdiction. Both defendants have brought motions for summary judgment. Having heard oral arguments of counsel for the parties, and upon consideration of the parties submissions and applicable law, the Court hereby grants both defendants' motions.

## I.  FACTS

Plaintiff Cynthia Neagos was injured on January 4, 1988 when her glove and sleeve became tangled in a manually operated drill press during her employment at Borg–Warner Automotive, Inc., in Sterling Heights, Michigan. Plaintiffs, Michigan residents, brought suit against Defendant Valmet–Appleton Inc. (Valmet), a Wisconsin corporation; and Defendant Chicago Curdworth Service Company, Inc. (Curdworth), an Illinois corporation, contending that both defendants are corporate successors to the original manufacturer of the drill press which caused Cynthia's injuries. Plaintiffs assert claims for negligent design, negligent failure to warn, and breach of express or implied warranties, as well as loss of consortium. Plaintiffs do not allege that either defendant had any direct contact with the drill press.

The drill press in question is a Cleereman model DC drilling machine; and was manufactured in 1937 by the Cleereman Machine Tool Company, of Green Bay, Wisconsin (Cleereman Wisconsin). Some time after its manufacture the drill press was sold to Borg & Beck of Chicago, Illinois. Borg & Beck (now known as Borg–Warner) transferred the drill press to its facility in Sterling Heights, Michigan in 1973.

Although the record does not indicate when, it is undisputed that prior to 1975, Cleereman Wisconsin sold some, and possibly all, of its assets to the Kearney & Trecker Corporation of Wisconsin. In 1975 Kearney & Trecker sold certain of its assets to the Appleton Machine Company. In that transaction Kearney & Trecker conveyed to Appleton Machine

all of the jigs, fixtures, patterns, designs, tooling, transparencies, literature and manuals, machine and material specifications, engineering data, customer files and lists, and unfilled customers' orders, which the Seller owns in connection with the manufacture and sale by the Seller of a line of machine tools known generally as "upright drills"....

Agreement of Sale between Kearney & Trecker and Appleton Machine, dated December 3, 1975. The line of drills included the "Cleereman Model DC Sliding Head Drilling Machine." In addition, Kearney & Trecker assigned the entire right, title and interest in the registered and common-law trademarks and goodwill to the "CLEEREMAN" name, subject to the rights previously granted by Kearney & Trecker to Lio Ho Machine Works, LTD., of Taiwan, Republic of China. Kearney & Trecker also granted to Appleton Machine "a non-exclusive royalty-free license with the right to grant sublicenses, to make, have made, use and sell products employing or resulting from the practice of the inventions claimed in the patent [Serial No. 3,191,260, Machine tool turret having multiple tools, issue date 6/29/65]."

In 1983 Appleton Machine Company was purchased by O.Y. Wartsila, AB. Subsequent to that purchase Valmet Corporation and O.Y. Wartsila, AB formed a holding company which became known as Valmet Paper Machinery, Inc. Although the parties are vague as to what happened next, it appears that Appleton Machine Company became a subsidiary of Valmet Paper Machinery, and somewhere along the line the entity or entities became known as Wartsila–Appleton. In January of 1987 a name change occurred and Wartsila–Appleton became Valmet–Appleton, Inc., one of the named defendants.

In 1986, Valmet–Appleton's corporate predecessor, Wartsila–Appleton, sold some its assets to H.W. Ward, Inc., of Illinois, which later formed Cleereman Machine Tool, Inc. (Cleereman Illinois).[1] In that asset purchase agreement H.W. Ward purchased substantially all of the operating assets of Wartsila–Appleton's Cleereman Division, including: all inventory (with certain minor exceptions); patents; goodwill, including the exclusive right to use the name Cleereman and its logos, subject to Lio Ho Machine Works' rights; and contractual rights of Wartsila–Appleton for product warranty claims. The purchase agreement specifically excluded all liabilities, fixed or contingent, of Wartsila–Appleton. *See* Asset Purchase Agreement between Wartsila–Appleton and H.W. Ward, dated June 23, 1986. After this transfer H.W. Ward became known as Cleereman Machine Tools, Inc. (Cleereman Illinois).

Finally, in 1990, Cleereman Illinois transferred some of its assets to defendant Chicago Curdworth. This agreement provided in pertinent part:

> Seller shall sell to Purchaser free from all liens and encumbrances, those assets of the Business including the name and style of said business CLEEREMAN MACHINE TOOLS, telephone number, fax number, customer list, goodwill, pattern equipment, drawings, cardex, microfilm records and documents, machinery, equipment and furniture ... and the inventory of all Cleereman parts.... At the time of closing the Seller corporation will change its name and assign to Purchaser the right to the exclusive use of the name CLEEREMAN MACHINE TOOLS, and Seller will assign to Purchaser all its right under an existing computer lease agreement.

Agreement between Cleereman Machine Tools, Inc., and Chicago Curdworth Service Co., Inc., dated March 16, 1990. This

agreement also expressly provided that Chicago Curdworth had not agreed to "assume, pay or perform or otherwise discharge any debts, obligations and liabilities of Seller."

Plaintiffs brought this lawsuit in 1991, alleging that Valmet–Appleton and Chicago–Curdworth were liable as corporate successors of Cleereman Wisconsin. Plaintiff's employer, Borg–Warner, was not named as a defendant. Valmet–Appleton filed a motion to dismiss on the grounds that it had no connection whatsoever with the drill press, and could not therefore be liable. Valmet–Appleton also contended that it was not subject to jurisdiction in Michigan. Chicago Curdworth joined in the motion. Judge Friedman[2] denied the motion without prejudice, stating that it was premature pending the conclusion of discovery. The instant motions followed the close of discovery.

## II. STANDARD OF REVIEW

In considering a motion for summary judgment, the Court may grant the motion only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).[3] As the Supreme Court ruled in *Celotex*, "[r]ule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Court must view the allegations of the complaint in the light most favorable to the non-moving party. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983), *cert. denied*, 469 U.S. 826, 105 S.Ct.

---

**1.** It is clear that Valmet–Appleton had already sold its Cleereman assets by the time of Plaintiff's accident.

**2.** This case was transferred to the Honorable Nancy G. Edmunds of the Eastern District of Michigan on February 26, 1992, by Administrative Order # 92–80–025.

**3.** On a motion for summary judgment in a diversity case such as this, the provisions of Federal Rule of Civil Procedure 56 control its determination. *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 459 (6th Cir.1986).

105, 83 L.Ed.2d 50 (1984). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 265, 106 S.Ct. 2505, 2519, 91 L.Ed.2d 202 (1986). Notwithstanding, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the nonmoving party. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. In other words, summary judgment is proper if the non-moving party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

## III. ANALYSIS

### A. *Personal Jurisdiction*

■ Defendant Valmet–Appleton contends that this Court lacks personal jurisdiction over it. Thus the Court's initial inquiry is whether Valmet-Appleton has sufficient contacts with the State of Michigan to satisfy both the requirements of the Michigan long-arm statute and the due process clause of the Constitution. *See Theunissen v. Matthews,* 935 F.2d 1454, 1459 (6th Cir.1991) (federal district court sitting in diversity must apply law of forum state in determining whether it may exercise jurisdiction over non-resident defendant subject to constitutional concerns of due process) (citations omitted). In addition to state statutory criteria, due process requires that before a nonresident defendant may be subject to judgment in personam, that he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940)). In other words, the defendant's conduct must be such that "he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v.*

*Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

■ The burden of showing that *in personam* jurisdiction exists is on the plaintiff. *Market/Media Research, Inc. v. Union–Tribune Publishing Co.,* 951 F.2d 102, 104 (6th Cir.1991) (citing *Theunissen,* 935 F.2d at 1458). Because resolution of the jurisdictional question was reserved until the completion of discovery, Plaintiffs burden of proof on this issue is the same as it would be at trial, the preponderance of the evidence; *see Serras v. First Tennessee Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir.1989) (if disposition of Rule 12(b)(2) motion is deferred until trial, plaintiff's burden on jurisdiction issue is preponderance of the evidence).

■ In Michigan there are two statutory bases of long-arm jurisdiction over corporations. The first, Mich.Comp.Laws Ann. § 600.711, confers "general" personal jurisdiction over a corporate defendant if it is incorporated in Michigan; has consented to jurisdiction; or carries on a continuous and systematic part of its general business within the state. *Id.* In cases of general jurisdiction, the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state without violating due process because the defendant's contacts with the forum state are "continuous and systematic." *Third Nat'l Bank in Nashville v. Wedge Group Inc.,* 882 F.2d 1087, 1089 (6th Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990). The unrefuted affidavit of Valmet-Appleton's Vice–President of Administration, Jon A. Kester, states that Valmet-Appleton has its principal place of business in Wisconsin; does not have any facilities in Michigan, is not qualified to do business in Michigan; does not have an office, registered agent, or bank account in the state; does not have a sales tax number and has not paid taxes or manufactured any product in Michigan. Thus it is clear that there is no basis, statutory or constitutional, for the exercise of general personal jurisdiction over Valmet-Appleton.

The other statutory basis is "specific" or "limited" jurisdiction, found at Mich. Comp.Laws Ann. § 600.715. The exercise of this type of jurisdiction occurs where "a State exercises jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific personal jurisdiction may be exercised under the Michigan long-arm statute where the claim being litigated is one "arising out of" an act or acts creating any of five designated relationships, *See LAK, Inc. v. Deer Creek Enters.,* 885 F.2d 1293, 1298 (6th Cir.1989), *cert denied,* 494 U.S. 1056, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990); three of which are arguably applicable here. The statute provides:

> The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation *arising out of the act or acts* which create the following relationships:
>
> (1) The transaction of any business within the state.
>
> (2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.
>
> .  .  .  .  .
>
> (3) Entering into a contract for services to be performed or for materials to be furnished in this state by the defendant.

Mich.Comp.Laws Ann. § 600.715 (emphasis added).

Application of the state limited personal jurisdiction statute is a two-part test: the "arising out of" requirement, and the relationship component. It is apparent from the construction of the state statute that the "arising out of" component of limited jurisdiction is preliminary to the relationship criterion. In *Lanier v. American Bd of Endodontics,* 843 F.2d 901 (6th

Cir.) *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988), the Sixth Circuit held that the "arising out of" requirement of Mich.Comp.Laws § 600.715(1) is satisfied if the cause of action was "made possible by" or "lies in the wake of" the defendant's contacts with the forum. *Id.* at 909; *see also Third Nat'l Bank,* 882 F.2d at 1091 (citing *Lanier* ).

The only evidence Plaintiffs offer to establish the "arising out of" criterion is the December 3, 1975 Agreement of Sale between Kearney & Trecker Corporation and the Appleton Machine Company whereby the parties agreed that:

> On or before the closing date or within not more than thirty days thereafter, the Seller shall exert its best efforts to obtain and furnish to the buyer the written consent of the customers whose unfilled orders to the Buyer shall have been included in the assets to the assignment of such orders to the Buyer and to the filling of such orders with products manufactured by the Buyer, or the written consent of such customers to the cancellation of such orders without cost to or obligation or liability on the part of the Buyer; but if any such customer shall refuse to consent to such an assignment and the Seller shall determine to fill such customer's unfilled order, the filling of such unfilled order shall not be deemed to be a violation of (5)(e) [seller's covenant not to compete] above; and
>
> with respect to each unfilled order assigned to the Buyer and filled by the Buyer as contemplated by (a), above, the Buyer shall reimburse the Seller, promptly after the Buyer's receipt of the customer's payment for the products delivered under such order, for the commission paid by the Seller to the sales employee or agent of the Seller who shall have placed such order; and the amount of such commission ... discount shall be determined in conformity with the Seller's compensation, agency or dealer agreement....

Also, attached to the Agreement of Sale is a list of orders pending as of the date of the sale. Included on the list are what

appear to be two Michigan corporations. There is no proof in the record however demonstrating whether any such orders were ever in fact filled by Appleton. Notwithstanding, Plaintiffs argue that by contracting to provide products in the State of Michigan as the corporate successor of Cleereman Wisconsin, there is a sufficient nexus between this lawsuit and Defendant's activities in the state.

Plaintiffs' contention is not supported by the record. There is no evidence before the Court to show that Plaintiffs' injuries were "made possible by" or "lie[ ] in the wake of" any of the various terms of the aforementioned Agreement of Sale. It is undisputed that Valmet–Appleton had no contact whatsoever with the drill press that injured Plaintiff. Furthermore, Defendant Valmet–Appleton's contacts with the State of Michigan presumably ended in 1985 when Appleton sold its Cleereman assets; and Plaintiff's injury did not occur until January 1988. Finally, the language of the agreement does not support Plaintiffs' position that Appleton "contracted" to provide products in Michigan, since the plain language of the agreement indicates that a precondition to Appleton's filling of the various orders was the written consent of the customer. Plaintiffs offer no evidence to show that anything of the sort occurred.

It cannot be concluded on this record that Plaintiff's injuries "arose out of" the December 3, 1975 contract for purposes of the state long-arm statute. Therefore, the Court need not determine whether the alleged contact fits within one of the five relationships enumerated in the statute. Given that the state long-arm statute is not satisfied, the Court also does not need to address the constitutional concerns.[4]

Although not briefed by the parties, this Court notes that a number of other courts have applied the rationale of successor liability in the exercise of jurisdiction over a nonresident defendant over which it would not otherwise have jurisdiction. In other words, these courts hold that a corporation's contacts with the forum may be imputed to the successor if forum law would hold the successor liable for the actions of its predecessor. See *Williams v. Bowman Livestock Equip.*, 927 F.2d 1128, 1132 (10th Cir.1991); (applying Oklahoma law); *City of Richmond v. Madison Management Group*, 918 F.2d 438, 454 (4th Cir.1990) (Virginia law); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir.1982), *aff'd sub nom Pallas Agency, Ltd., v. Duris*, 461 U.S. 529, 103 S.Ct. 1991, 76 L.Ed.2d 120 (1983); *Inter–Americas Ins. Corp., Inc. v. Xycor Sys. Inc.*, 757 F.Supp. 1213, 1217 (D.Kan.1991) (Kansas law); *Mesiti v. Microdot, Inc.*, 739 F.Supp. 57, 60 (D.N.H. 1990) (New Hampshire law); *Bowers v. NETI Technologies, Inc.*, 690 F.Supp. 349, 361 (E.D.Pa.1988) (Pennsylvania law); *Explosives Corp. v. Garlam Enters. Corp.*, 615 F.Supp. 364, 367 (D.P.R.1985) (applying general principles without specifying state), *cause dismissed*, 782 F.2d 1023 (1st Cir.1985); *Maryland Nat'l Bank v. Shaffer Stores Co.*, 240 F.Supp. 777, 780 (D.Md. 1965). *But see Johnston v. Pneumo Corp.*, 652 F.Supp. 1402, 1406 (S.D.Miss. 1987) (where court expressly declined to hold that contacts with forum could be attributed to successor corporation merely because the successor corporation purchases assets and liabilities of predecessor which is subject to personal jurisdiction of the state).

As noted by one court,

The basic test is to gear the jurisdiction question to whether, as a substantive matter, the successor corporation may be liable for the obligations of the predecessor. The mere fact that a corporation acquires all the assets of another does not necessarily mean it will be liable for the obligations of its predecessor. If it is

---

**4.** It is equally clear that Defendant Valmet–Appleton's contacts with the forum would fail to satisfy the requirements for limited personal jurisdiction under the due process clause. *See Southern Machine Co. v. Mohasco Indus., Co.*, 401 F.2d 374, 381 (1968) (setting forth three-part test for specific jurisdiction; namely that defen-

dant must purposefully avail itself of privilege of acting in forum state, cause of action must "arise from" defendant's activities there, and defendant's connection with forum must be substantial enough to make exercise of jurisdiction reasonable).

liable for the predecessor's obligations, however, it will be subject to long-arm jurisdiction in a suit to enforce the obligation if the predecessor would have been subject to such jurisdiction.

*Xycor Sys.*, 757 F.Supp. at 1217 (*quoting* R. Casad, JURISDICTION IN CIVIL ACTIONS ¶ 4.03[5][d] (1983) (footnotes omitted)).

The rule of these cases is designed to prevent a corporation from fleeing the jurisdiction and then changing its name to immunize itself from long-arm jurisdiction. *City of Richmond,* 918 F.2d at 454–55. *See also, Duris,* 684 F.2d at 356 ("[a]ny other ruling would allow corporations to immunize themselves by formalistically changing their titles.").

Thus, if this Court were to find that under Michigan law Defendant Valmet–Appleton was the corporate successor of Cleereman Wisconsin, then any contacts of Cleereman Wisconsin could be imputed to Valmet–Appleton for purposes of personal jurisdiction.

### B. *Successor Liability*

All parties agree that the leading case on the doctrine of successor liability under Michigan law is *Turner v. Bituminous Casualty and Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976). In *Turner* the Michigan Supreme Court adopted the rule of "continuity of enterprise" for product liability cases which arise subsequent to corporate transfers. *Pelc v. Bendix Mach. Tool Corp.,* 111 Mich.App. 343, 352, 314 N.W.2d 614 (1981). *Turner* held that the following three criteria [5] shall be guidelines to establish whether there is continuity between a transferee and a transferor corporation. Those are:

(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

.    .    .    .    .

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

397 Mich. at 420, 244 N.W.2d 873 (*quoting Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 801 (W.D.Mich.1974)). *See also Conrad v. Rofin–Sinar, Inc.,* 762 F.Supp. 167, 170 (E.D.Mich.1991); *Kelley v. Thomas Solvent Co.,* 725 F.Supp. 1446, 1457 (W.D.Mich.1988); *Korzetz v. Amsted Indus., Inc.,* 472 F.Supp. 136, 143 (E.D.Mich.1979); *Fenton Area Public Schools v. Sorensen–Gross Co.,* 124 Mich. App. 631, 335 N.W.2d 221 (1983); *Pelc,* 111 Mich.App. 343, 314 N.W.2d 614; *Powers v. Baker–Perkins Inc.,* 92 Mich.App. 645, 285 N.W.2d 402 (1979). *See also Antiphon v. LEP Transport,* 183 Mich.App. 377, 454 N.W.2d 222 (1990); (applying doctrine of equitable estoppel in successor liability context).

Two cases in particular are illustrative for purposes of applying the *Turner* criteria in this case. The first is *Turner* itself. There the Michigan Supreme Court found that the plaintiff had made out a prima facie of successor liability. In *Turner,* the plaintiff was injured in 1969, during the course of employment by a power press manufactured by the Old Sheridan Co. The power press had apparently been purchased by the plaintiff's employer in 1968. In 1964, the Harris–Intertype Corp. purchased the entire business, good will, name, and assets of Old Sheridan. 397 Mich. at 412, 244 N.W.2d 873. Harris also agreed to assume certain liabilities of Old Sheridan, including "all debts, obligations, con-

---

**5.** Taken from *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 801 (W.D.Mich.1974), which cited *McKee v. Harris–Seybold Co.,* 109 N.J.Super. 555, 264 A.2d 98 (1970), *aff'd,* 118 N.J.Super. 480, 288 A.2d 585 (1972). These cases came up with four criteria, but the *Turner* court was explicit in adopting only the first, third, and

fourth. *See Turner,* 397 Mich. at 429–30, 244 N.W.2d 873. The second factor, dealing with the continuity of shareholders, was found by the *Turner* court to be irrelevant in evaluating the continuity of the business for product liability purposes. *Id.* at 429, 244 N.W.2d 873.

tracts and liabilities of Old Sheridan of any kind, character or description, whether accrued, absolute, contingent or otherwise...." *Id.* at n. 2. Harris then created a wholly-owned subsidiary designated as "New Sheridan," which acquired all of the assets of Old Sheridan. New Sheridan continued the business, and Old Sheridan was dissolved. The Plaintiff sued Harris and New Sheridan. The trial court granted summary judgment for the defendants, on the grounds that they were "not responsible for a product to which they are corporate strangers in the manufacture, sale, and distribution, thereof, and for which they neither in fact nor law assumed legal liability." 397 Mich. at 413, 244 N.W.2d 873. The court of appeals denied leave to appeal.

In reversing, the Michigan Supreme Court held that a successor corporation can be held liable under products liability law for a defective product manufactured by a predecessor if there is a continuity of the business and if the predecessor is defunct. In *Turner* continuity of the enterprise was established because there was retention of key personnel, assets, general business operations and the Sheridan name; the predecessor corporation dissolved soon after the sale of assets; the successor corporation assumed the liabilities and obligations of the predecessor; and the purchasing corporation held itself out to the world as the effective continuation of the seller corporation. 397 Mich. at 430, 244 N.W.2d 873.

In contrast, the Michigan Court of Appeals found in the *Pelc* case that the plaintiff had failed to make out a prima facie case of successor liability under *Turner.* The plaintiff in *Pelc* was injured in 1977 while operating a broaching machine manu-

factured in 1943 by Old Colonial Broach and Machine Company ("Old Colonial"). 111 Mich.App. at 346, 314 N.W.2d 614. Old Colonial had been liquidated in 1974, and Michigan Special Machine ("MSM"), a subsidiary of Bendix, had purchased a small portion of Old Colonial's machinery, equipment at a public auction. MSM had also contracted with three of Old Colonial's former customers to complete assembly of their machines (which had not been completed by Old Colonial due to the bankruptcy) on Old Colonial's former premises. During the ten month period it took to complete the project, MSM hired two of Old Colonial's ex-foremen and one of its chief engineers. *Id.* at 348, 314 N.W.2d 614. Finally, MSM purchased from the bankruptcy estate "all technical information and proprietary rights necessary to manufacture and market Old Colonial products,"[6] including the exclusive right to use the name Colonial Broach and Machine Company. *Id.* at 348–49, 314 N.W.2d 614. In total, MSM paid $220,000 for Old Colonial's assets, approximately 8% of the total bankruptcy estate.

Using this equipment, MSM began producing broach machines under the name "Colonial" or "Bendix Colonial." MSM also used the informational brochures that had been printed by Old Colonial; and later distributed a sales brochure which identified itself as having been in the business of manufacturing broaching machines for the "last 60 years." *Id.* at 349, 314 N.W.2d 614. Finally, MSM hired one managerial employee and six to eight other employees. *Id.* at 350, 314 N.W.2d 614.

Applying the criteria adopted in *Turner,*[7] the Michigan appellate court concluded

---

**6.** This included Old Colonial's patents, trademarks and copyrights relating to Old Colonial's products, operating and maintenance manuals, technical reports, patterns, parts lists, material lists, customer lists and vendor lists. *Pelc,* 111 Mich.App. at 348, 314 N.W.2d 614.

**7.** The Michigan Court of Appeals in *Pelc* erroneously stated that *Turner* adopted four factors— the three stated above, plus a criterion that "[t]he purchasing corporation holds itself out to the world as the effective continuation of the seller corporation." 111 Mich.App. 352–53, 314

N.W.2d 614. Rather, the *Turner* court specifically stated that it was adopting "the first, third, and fourth criteria quoted in *Shannon* from *McKee* as tests of continuity of interest." 397 Mich. at 429, 244 N.W.2d 873. The fourth factor added by the *Pelc* court was characterized in *Turner* as a "second aspect of continuity." *Turner,* 397 Mich. at 426, 244 N.W.2d 873; and was discussed only as evidence showing how the successor in that case was carrying on the business of the predecessor. Thus, "holding itself out as the effective continuation of the predecessor" is not a separate factor, but is

that "we are not convinced that the totality of the transaction demonstrates the basic continuity of enterprise envisioned by *Turner.*" *Id.* at 353, 314 N.W.2d 614. As for the first *Turner* factor, the court found that there was no continuity of management, personnel, physical location, assets or general business operations. The court of appeals also emphasized that Bendix had purchased less than 8% of the assets sold by the bankrupt estate. Nor did it purchase the accounts receivable or any of Old Colonial's contractual business agreements with its customers. *Id.* at 353, 314 N.W.2d 614. With regard to the second criterion, the *Pelc* court observed that Old Colonial was liquidated *prior* to, not *after*, the defendant's purchase of the assets. *Id.* Third, the Michigan Court of Appeals pointed out that the "[d]efendant did not assume any liabilities and obligations of Old Colonial ordinarily necessary for the uninterrupted continuation of Old Colonial's normal business operations." *Id.* [8]

■ Applying the *Turner* factors to the present case, the Court concludes that neither of the defendants is a "continuation of the enterprise" of Cleereman Wisconsin, such that liability for Plaintiff's injuries may be imputed to either defendant.

### 1. Defendant Valmet–Appleton

To establish "continuity of enterprise," Plaintiffs rely on the December 3, 1975 Agreement of Sale between Kearney & Trecker and Appleton. Plaintiffs claim that as a result of this agreement there was no interruption in the manufacture and sale of Cleereman products to customers, and that orders pending on the date of the Agreement of Sale were apparently filled by this defendant. Further, Plaintiffs point out that for approximately one year prior to the date of the execution of that agreement, Appleton had been manufacturing Cleereman products under subcontract

with Kearney & Trecker. Defendant Valmet–Appleton contends that "continuity of enterprise" is absent, since there was no transfer of machinery, employees or key management personnel from Cleereman or Kearney & Trecker to Appleton in Appleton's purchase of certain Cleereman assets from Kearney & Trecker.

Jon Kester, Vice President of Administration for Valmet–Appleton, testified in his deposition that Appleton "purchased specific assets pertaining to the Cleereman line;" and that "[t]here were other Cleereman assets that remained with Kearney and Trecker." Kester also stated that "Kearney and Trecker still exists" and manufactures machine tools, including certain Cleereman drilling machines. In particular, Kester testified that Kearney & Trecker "retain[ed] the numerically controlled drill presses that were a part of the Cleereman line. They continued manufacturing the numerically controlled Cleereman drill presses." Furthermore, according to the terms of the December 3, 1975 Agreement of Sale, Appleton contracted to purchase all of the assets, including the Cleereman trademark, necessary to manufacture four kinds of Cleereman drills, generally known as upright drills. Thus, the agreement of sale itself establishes that Appleton purchased only a *line* of Cleereman tools, rather than a whole enterprise.

Kester further testified that to his knowledge, no employees of Kearney & Trecker went to work for Appleton as a result of the purchase of assets. Moreover, Appleton never assumed Kearney & Trecker's physical location. Kearney & Trecker was, and still is, located in West Allis, Wisconsin; Appleton was, and still is, located in Appleton, Wisconsin. Plaintiffs have offered no evidence to counter any of these points. On this record, there is no "continuity of management, personnel,

evidence that goes to the "continuation of the enterprise" factor. *See id.* at 430–31, 244 N.W.2d 873.

**8.** In *Fenton Area Public Schools v. Sorensen–Gross Constr. Co.,* 124 Mich.App. 631, 643–44, 335 N.W.2d 221 (1983), the Michigan Court of

Appeals provided examples of what constitutes such "liabilities and obligations: "assumption of liability for the mortgage, past taxes, and insurance on the [building where the corporate offices were located] and liability for the payment of workers' compensation for the employees that it hired from [the predecessor]."

physical location, assets [or] general business operations."

Regarding the second *Turner* factor, it is clear that Kearney & Trecker did not "cease[ ] its ordinary business operations, liquidate[ ], and dissolve[ ] as soon as legally and practically possible." As just noted, Kester testified that Kearney & Trecker is still in business today. Further, Valmet–Appleton has presented a document from the Wisconsin Secretary of State which provides that as of April 25, 1991 Kearney & Trecker is a viable corporation under Wisconsin law. Thus, this factor is also not met.

As for the third *Turner* factor, there is no evidence before the Court to suggest that Appleton assumed those liabilities and obligations necessary for the uninterrupted continuation of the seller corporation's normal business operations. There is no language in the December 3, 1975 Agreement of Sale between Kearney & Trecker and Appleton whereby Appleton agreed to assume any liability for Kearney & Trecker's or Cleereman Wisconsin's negligence. Plaintiffs' reliance on the fact that Defendant received a customer list from Kearney & Trecker and agreed to fill orders which were pending on the date of the execution of the Agreement of Sale is inapposite. First, a customer list is typically considered an asset, not a liability. *See e.g., Pelc,* 111 Mich.App. at 348, 314 N.W.2d 614 (including "customer lists" in catalogue of "assets" purchased by the defendant from predecessor corporation). Moreover, the language of the December 3, 1975 Agreement of Sale does not support Plaintiffs' assertion. The relevant provision of the Agreement reads:

> On or before the closing date or within not more than thirty days thereafter, the Seller shall exert its best efforts to obtain and furnish to the Buyer the written consent of the customers whose unfilled orders for products shall have been included in the assets to the assignment of such orders to the Buyer and to the filling of such orders with products man-

ufactured by the Buyer, or the written consent of such customers to the cancellation of such orders without cost to or obligation or liability on the part of the Buyer; but if any such customer shall refuse to consent to such an assignment and the Seller shall determine to fill such customer's unfilled order, the filling of such unfilled order shall no be deemed to be a violation of (5)(e), above;

A plain reading of this provision reveals that Appleton did not baldly assume the obligation to fill these unfilled orders. Rather it is apparent that the assignment of these unfilled orders was considered an "asset" under the Agreement. These are not the type of "liabilities and obligations" envisioned in the case law. *See Turner,* 397 Mich. at 413 n. 2, 244 N.W.2d 873; *Fenton Area Schools,* 124 Mich.App. at 643–644, 335 N.W.2d 221; *Pelc,* 111 Mich. App. at 348–49, 314 N.W.2d 614.

▪ Plaintiffs cite *Trimper v. Bruno– Sherman Corp.,* 436 F.Supp. 349 (E.D.Mich.1977), for the proposition that liability can be imposed on a successor corporation that carries on certain operations, or a certain product line, of a "predecessor," even if the predecessor continues operating in other fields. *Trimper* is a misapplication of *Turner,* which clearly requires the predecessor corporation to "cease its ordinary business operations, liquidate, and dissolve as soon as legally and practically possible." 397 Mich. at 420, 244 N.W.2d 873. Moreover, *Trimper* appears to have been flatly contradicted by *Pelc,* decided four years later, which held that *Turner* expressly adopted a "continuity of enterprise" analysis for determining successor liability, not a "product line" analysis.[9] *Pelc,* 111 Mich.App. at 355–56, 314 N.W.2d 614. Plaintiffs might well have succeeded under a "product line" analysis. However, that is not the test for successor liability under Michigan law.

In sum, there is no basis for imposing successor liability on Defendant Valmet–

---

**9.** The seminal case applying a "product line" analysis is *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). For a list of other "product line" cases, *see United States v. Distler,* 741 F.Supp. 637, 642 n. 5 (W.D.Ky.1990); *Pelc,* 111 Mich.App. at 355 n. 4, 314 N.W.2d 614.

Appleton in this case, because none of the *Turner* guidelines have been met. Since it was clear that the transfer between Kearney & Trecker and Appleton could not be characterized as a continuation of the enterprise, the Court does not need to explore what it believes is another link in the causation chain, namely the nature of the transfer between Cleereman Wisconsin and Kearney & Trecker.[10] Finally, because the Court concludes that Valmet–Appleton is not the corporate successor of Cleereman Wisconsin, it need not explore the question of whether Cleereman Wisconsin had sufficient contacts with the State of Michigan which could be imputed to Valmet–Appleton for purposes of exercising personal jurisdiction over the defendant.

2. Defendant Chicago Curdworth

■ It seems clear that if Appleton is not a successor of Kearney & Trecker, and therefore not liable for any negligence of the manufacturer, Cleereman Wisconsin; it is impossible for Chicago Curdworth to be a successor with such liability, since Chicago Curdworth is even further removed the manufacturer than is Appleton.

Plaintiffs concede in their brief that the transfer of assets from Appleton to H.W. Ward involved "all the assets necessary for the continuation of the 'Cleereman line' of drill presses." Under *Turner* and *Pelc,* this is not sufficient to establish successor liability. In addition Kester testified that Appleton is still today a going concern; *Turner* requires the predecessor to dissolve "as soon as legally and practically possible" after the transfer of assets. For these reasons alone, the transfer from Appleton to H.W. Ward, Inc., does not satisfy *Turner.* Furthermore, in the Agreement of Sale between Cleereman Illinois and Chicago Curdworth, the latter corporation specifically indicated that it did not agree to assume, pay, or otherwise discharge any debts, obligations or liabilities of Cleereman Illinois.

Plaintiffs assert that Chicago Curdworth carried on the business of Cleereman Illinois at the same location; and that Cleereman Illinois dissolved within one year of this sale of assets. Even assuming this is true, the requirements of *Turner* are not met. As noted above, the chain of liability was broken all the way back in 1975, when Kearney transferred, at most, part of a product line to Appleton. Plaintiffs have simply shown that this portion of the Cleereman product line has been passed on from Kearney to Appleton to H.W. Ward to Chicago Curdworth. Under *Pelc,* however, successor liability requires continuity of an enterprise, not a product line.

### IV. CONCLUSION

For all the foregoing reasons, the Court concludes that it does not have personal jurisdiction over Defendant Valmet–Appleton, either directly or imputed. Accordingly, Defendant Valmet–Appleton's motion for summary judgment is GRANTED on the basis that the Court lacks *in personam* jurisdiction over this defendant. In the alternative, if the exercise of personal jurisdiction by this Court is proper, the Court holds that Valmet–Appleton is entitled to summary judgment on the merits. As to Defendant Chicago Curdworth, the Court finds that Plaintiffs have failed to create a genuine issue of material fact as to the issue of successor liability under Michigan law. Defendant Chicago Curdworth's motion for summary judgment is GRANTED on the merits.

---

**10.** Nor did any party brief the issue.